# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE: ) | |
| ) | CHAPTER 7 |
| MICHAEL S. GOLDBERG, LLC, and ) | |
| MICHAEL S. GOLDBERG, ) | CASE NO. 09-23370 (ASD) |
| ) | CASE NO. 09-23371 (ASD) |
| ) | |
| DEBTORS. ) | JOINTLY ADMINISTERED |
| ) | UNDER CASE NO. 09-23370 |
| _____ ) | |
| JAMES BERMAN, CHAPTER 7 TRUSTEE ) | |
| FOR ) | |
| MICHAEL S. GOLDBERG, LLC, et al., ) | ADVERSARY PROCEEDING |
| ) | NO. 10-2082 |
| PLAINTIFF, ) | |
| ) | |
| v. ) | |
| ) | |
| MICHAEL S. GOLDBERG, LLC; ) | RE: ECF NO. 94 |
| MICHAEL S. GOLDBERG; ) | |
| EDWARD MALLEY; SCOTT LABONTE ) | |
| KABLICK & LEARY; P.C.; JON LEARY; ) | |
| JON LEARY, TRUSTEE; LAURA LEARY; ) | |
| TRACEY MALLEY, a/k/a Tracey Fyler); ) | |
| EDWARD MALLEY REVOCABLE TRUST; ) | |
| DEBORAH BIANCA a/k/a Deborah ) | |
| Tanasi; SAL CRANSTON, LLC; ) | |
| SAL NORTH HAVEN, LLC; ) | |
| MILLER MOTOR CARS; RCZS, LLC; ) | |
| JOSEPH MICHAUD; CHRISTOPHER LEARY; ) | |
| JENNY ANGELILLO; TYLER WESTCOTT; ) | |
| FRANK METE/365 ENTERTAINMENT; ) | |
| BARBARA PETERSON; ) | |
| CHRISTOPHER GILNACK; EDWIN LEWIS; ) | |
| PRIMARY FINANCIAL SERVICES; ) | |
| YANKEE WINDOWS & MORE; ) | |
| BARBARA PREISSER; ROBERT WRIGHT; ) | |
| RONALD WRIGHT; SETH I. BEN-EZRA, P.C.; ) | |
| LOIS DONNELLY; ) | |
| POLIVY & TASCHNER, TRUSTEE; ) | |
| RUBEN, JOHNSON, MORGAN & ) | |
| HORAN, P.C., TRUSTEE; ) | |
| TYLER WESTCOTT, TRUSTEE; ) | |

RAMIRO ALCAZAR; NORM PETIT;                    )
MAURA ALLEN;                                   )
DEVCON MANCHESTER, LLC;                        )
PAUL BIANCA; CHAD LABONTE;                     )
RYAN GOMES/RYAN GOMES, INC.;                   )
TONY DEFELICE; DEVCON COMMONS,                 )
LLC; AND LAUNDRY EXPRESS, LLC,                 )
                                               )
DEFENDANTS.[1]                                 )
_____ )

**APPEARANCES:**

James Berman, Esq.,                     Attorneys for James Berman,
Jeffrey Hellman Esq.,                   Plaintiff/Chapter 7 Trustee
Jed Horwitt, Esq.,
John L. Cesaroni, Esq.,
Stephen M. Kindseth, Esq.,
Elana C. Bloom, Esq.,
James M. Moriarty, Esq.,
Zeisler & Zeisler, P.C.,
10 Middle Street
15th Floor
Bridgeport, CT 06604

Larry S. Grossman, Esq.
Hurwitz Sagarin Slossberg & Knuff, LLC
147 North Broad Street
Milford, CT 06460

Jeffrey M. Sklarz, Esq.
Green & Sklarz, LLC,
700 State Street (Suite 304)
New Haven, CT 06510

---

[1]The Plaintiff, James Berman is no longer seeking a recovery against the majority of the captioned defendants, including the Debtors, in that many of the claims have either been dismissed, had defaults entered, or were settled, severed or withdrawn. Michael S. Goldberg, as discussed *infra,* n.3. , is in prison. Nor is a judgment being sought against Chad LaBonte who has filed bankruptcy in Florida. On June 13, 2011, the first day of Trial, the Plaintiff reported that he had reached a settlement with defendants Jon Leary, Laura Leary and Kablik & Leary, P.C. As a consequence, as of the date of this decision, the Plaintiff is only proceeding against the following: Edward Malley, Tracey Malley, Scott LaBonte, SAL Cranston, LLC, SAL North Haven, LLC, RCZS, LLC, Devcon Manchester, LLC, Devcon Commons, LLC, Deborah Bianca, the Edward Malley Revocable Trust, and Laundry Express, LLC (collectively hereinafter, the "Defendants").

2

Joseph B. Burns, Esq.,                    Attorneys for Edward Malley and
Austin J. McGuigan, Esq.,                 Tracey Malley
Rome McGuigan, PC.,
One State Street
13th Floor
Hartford, CT 06103

Ross G. Fingold, Esq.,                    Attorneys for Scott LaBonte, Chad
Mark S. Shipman, Esq.                     LaBonte, SAL North Haven, LLC,
Shipman, Spokesbury & Fingold, LLC,       SAL Cranston, LLC, RCZS, LLC,
20 Batterson Park Road                    Devcon Manchester, Devcon
Suite 120                                 Commons, LLC
Farmington, CT 06032

David M.S. Shaiken, Esq.,
Shipman, Shaiken & Schaefer, LLC
433 South Main Street
Suite 319
West Hartford, CT 06110

John A. Barbieri, Esq.                    Attorney for Deborah Bianca
Barbieri Law, LLC,
18 Cedar Street
P.O. Box 1445
New Britain, CT 06050

## AMENDED[2] PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

ALBERT S. DABROWSKI, United States Bankruptcy Judge:

## I. INTRODUCTION

This adversary proceeding filed by James Berman, Chapter 7 Trustee (hereinafter,

the "Plaintiff" or "Trustee") concerns an individual Debtor, Michael S. Goldberg (hereinafter,

"Goldberg") and a related entity, Debtor Michael S. Goldberg, LLC, (hereinafter, "Goldberg,

LLC") occasionally, d/b/a Acquisitions Unlimited Group, controlled by Michael S. Goldberg,

---

[2]The Amendments set forth herein are limited to effecting non-substantive changes as to counsel on pages 2-3 of *Proposed Findings of Fact and Conclusions of Law*, ECF No. 703. No changes have been made with respect to pages 4 through 96 of those Findings and Conclusions. .

collectively, hereinafter, the "Debtors") that created a "classic" or "pure" "Ponzi"[3] investment scheme whereby the Debtors, while lacking any legitimate business interests, nevertheless convinced numerous individuals and entities to invest money with them by guaranteeing very substantial profits supposedly derived from their successful business ventures.[4]  With respect to the investors who are the Defendants in this adversary proceeding, the Debtors represented themselves to be preferred vendor/providers of bank repossessed or otherwise recovered business assets that they were permitted to sell at a substantial profit.[5]

　　In fact, the only revenues derived in connection with this and the Debtors' other

---

[3]A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi.  Beginning with capital of $150, Ponzi gave promissory notes to borrowers to whom he promised a full return in 90 days with interest of 50%.  In 1919, over the course of eight months he collected close to $10 million dollars using the funds of new lenders to pay off the debts of the old.  *See Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924).  As described by the United States Supreme Court in *Cunningham*, "[H]e spread the false tale that on his own account he was engaged in buying international postal coupons in foreign countries and selling them in other countries at 100 per cent, profit, and that this was made possible by the excessive differences in the rates of exchange following the war. He was willing, he said, to give others the opportunity to share with him this profit. By a written promise in ninety days to pay them $150 for every $100 loaned, he induced thousands to lend him. He stimulated their avidity by paying his ninety-day notes in full at the end of forty-five days, and by circulating the notice that he would pay any unmatured note presented in less than forty-five days at 100% of the loan. Within eight months he took in $9,582,000 for which he issued his notes for $14,374,000. He paid his agents a commission of 10 per cent. With the 50 per cent promised to lenders, every loan paid in full with the profit would cost him 60 per cent. He was always insolvent and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes."  As described herein, the Debtors conducted their fraudulent operations in a remarkably similar manner.

[4]Goldberg pled guilty to three counts of Wire Fraud under 18 U.S.C. §1343, and on May 16, 2011, was *inter alia*, sentenced to serve 120 months on each count, to be served concurrently, as well as make restitution upon release.  According to the Judgement of Conviction, Pl. Ex. C, "[t]he defendant fraudulently induced approximately 350 individuals and organizations to provide him with a total of approximately $100 million over a twelve year period from 1997 to November 2009, on the understanding that the money would be invested in various deals.  As a result of the offense, approximately 120 individuals and organizations have lost about $30 million."

[5]In some instances, investors were also solicited to invest money in "diamond contracts" which purportedly would allow the Debtors to buy diamonds cheaply in New York and immediately resell them for large profits.

illusory ventures were the moneys the Debtors collected from a succession of new investors, whose money was then used to repay the earlier investors their original investment and guaranteed profits.  Thus, as with the Debtors here, Ponzi schemers are generally insolvent during the entire course of their operations.  While a Ponzi scheme can continue to operate without exposure using this formula for many years (in the notorious Bernard L. Madoff case, the scheme continued for decades, *see Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010)), in actual fact, at some point in time the ability to acquire new investors dries up and the number of past investors seeking repayment of their investments and paper profits will exceed the amount of new money being brought in, resulting in the inability of the Ponzi schemers to live up to their promises and exposure of the fraud. Thus, every Ponzi scheme is predestined to fail, with the most recent investors inevitably losing the most.

The Defendants that are the subject of this adversary proceeding were net "winners" in this investment scheme since they received a full return of their original investments plus the promised profit.  Unfortunately, their gain came at the expense of the "losers" whose own investments were either not repaid at all or only repaid in part.  The Trustee seeks to challenge and avoid these payments as preferential transfers under 11 U.S.C. §547, as fraudulent transfers under 11 U.S.C. §§548(a)(1)(A), 544(b)(1), and/or under Conn. Gen. Stat. §52-552e(a)(1), (the Connecticut Uniform Fraudulent Transfer Act, hereinafter, "CUFTA"), and recover them under 11 U.S.C. §§550(a) and 551.

## II. JURISDICTION

The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. §1334(a) and (b); and this Court derives its authority to hear and determine this proceeding on reference from the  District Court pursuant to 28 U.S.C. §§157(a) and (b)(1).  While the Plaintiff's Amended Complaint seeking the avoidance and recovery of preferences and fraudulent transfers is characterized as a "core" proceeding within the meaning of 28 U.S.C. §157(b)(2)(F) and (H) respectively, the Defendant, Scott LaBonte on June 20, 2014, filed a *Motion for Determination That the Claims Asserted Against Him are Stern Claims,* Adv. ECF No. 671 (hereinafter, "the LaBonte Motion"), arguing that the cases of *Stern v. Marshall,* 131 S. Ct. 2594 (2011) and *Granfinanciera S.A. v. Nordberg,* 492 U.S. 33 (1989), considered together, hold that bankruptcy courts are barred by Article III of the United States Constitution from entering final judgments in certain core proceedings, including suits to recover preferences[6] and fraudulent transfers.  Such proceedings are said to implicate the "private rights" of the litigants which are "quintessentially suits at common law" as opposed to "public rights" which arise from the bankruptcy itself.[7]  Recently, in *Exec. Bens. Ins. Agency v. Arkison,* 134 S. Ct. 2165 (2014), the Supreme Court held that

---

[6]Although neither *Stern* nor *Granfinanciera* dealt specifically with preference proceedings, it appears likely that the limitations on the bankruptcy court's constitutional authority apply equally to such actions, *see Pension Fin. Servs. v. O'Connell (In re Arbco Capital Mgmt., LLP),* 479 B.R. 254, 265-266 (S.D.N.Y 2012).  Further, the preference and fraudulent transfer claims are so interrelated here that it makes little sense for the Court to permit the possibility of inconsistent decisions were this Court to enter a final decision solely with respect to the preference claim, resulting in its being subject to a more limited review by the district court acting solely in its capacity as an appellate court.

[7]*Stern v. Marshall,* 131 S. Ct. at 2612-2613.  The limited exception recognized in *Katchen v. Landy,* 382 U.S. 323, 336-338 (1966), which permits a bankruptcy court to enter a final judgment even in a case that concerns "private rights," when defendants have filed proofs of claim is not implicated in this proceeding.  None of the Defendants have done so.

where the bankruptcy court lacks the constitutional authority to enter such final judgments, it may nevertheless issue proposed findings of fact and conclusions of law to the district court pursuant to 28 U.S.C. §157(c), notwithstanding that section's intended applicability to what are designated as "non-core" proceedings.

From a review of the lengthy history of this adversary proceeding, including the many days of trial devoted to resolving the matter, it would not be unreasonable for the Court to conclude that the Defendants have at least impliedly consented to this Court's full and final adjudication of the proceeding, especially since both the *Stern* and *Granfinanciera* decisions were issued more than three years prior to the filing of the LaBonte Motion; *In re Men's Sportswear, Inc.,* 834 F.2d 1134, 1138 (2d Cir. 1987) ("failure to object to Judge['s] . . . assumption of 'core jurisdiction' at any point in these extensive proceedings before the bankruptcy court and the further failure to object to any part of the appeal process in the district court constitutes consent to the final adjudication of this controversy before the bankruptcy court.").  In fact, the Plaintiff opposes the LaBonte Motion, none of the other Defendants in the adversary proceeding have joined in the LaBonte Motion, and the granting of such a motion will, of course, delay final resolution of the bankruptcy case and place additional financial burdens in the form of additional attorneys' fees upon the estate and the Defendants.  On the other hand, Fed R. Bankr. P. 7012(b) requires the *express* consent of all parties prior to a bankruptcy judge entering final orders in non-core proceedings.

Most important, however, the Supreme Court has agreed to determine in its current term the question as to "[w]hether Article III permits the exercise of the judicial power of the

United States by the bankruptcy courts on the basis of litigant consent, and if so, whether implied consent based on a litigant's conduct is sufficient to satisfy Article III," in the case of *Wellness Int'l Network, Ltd. v. Sharif,* 727 F.3d 751 (7th Cir. 2013), *cert. granted,* 134 S. Ct. 2901 (July 1, 2014) (No. 13-935).  The district court does have the power in the event the bankruptcy court erroneously entered a final judgment, to "cure" the bankruptcy court's error by reviewing the judgment *de novo* and separately entering judgment even if the proceeding is being considered in the context of an appeal.  *Executive Benefits Insurance Agency v. Arkison,* 134 S. Ct. at 2174-75.

Nevertheless, in light of the likelihood of the *Wellness* case settling the issue of consent, and since the Plaintiff and LaBonte agree and the Court concurs that it lacks authority to enter a final judgment absent at least implied consent, this Court has chosen to issue proposed findings of fact and conclusions of law which will be submitted to the United States District Court for the District of Connecticut for its review pursuant to 28 U.S.C. §157(c) and Fed. R. Bankr. P. 9033.  In accordance therewith, the District Court will review *de novo* those matters to which any party has timely and specifically objected, including the issue of consent in the course of the District Court's determination as to the extent and nature of its own review of the bankruptcy court's proposed findings of fact and conclusions of law.

## III.  PROCEDURAL BACKGROUND

On November 11, 2009, an involuntary bankruptcy petition under Bankruptcy Code §303(b) was filed against Goldberg, LLC, Case No. 09-23370, ECF No. 1[8].  On November

---

[8]References to "ECF No. _" refer to the docket of Case Nos. 09-23370 and 23371.

18, 2009, an involuntary bankruptcy petition was also filed against Goldberg, Case No. 09-23371, ECF No. 1.  On November 24, 2009, the Debtors consented to the entry of Orders for Relief, ECF No. 6 (Goldberg, LLC), ECF No. 4 (Goldberg).  At the 341 Meetings of Creditors held with respect to the Debtors on December 21, 2009, the  Trustee was elected to serve as Chapter 7 Trustee in both cases, which election was approved by the Court on January 11, 2010,[9] with the appointment entering on January 12, 2010.  On February 26, 2010, the Court granted an *Order Directing Joint Administration of Cases Pursuant to Fed. R. Bankr. P. 1015(b)* of both Debtors for procedural purposes with all filings (proofs of claim excepted) to be made in the Goldberg, LLC, case, ECF No. 60 (Goldberg, LLC), ECF No. 66 (Goldberg).  On November 2, 2010, the Court entered an *Order Approving Waiver of Discharge and Denying Debtor's [Michael S. Goldberg's] Discharge,* ECF No. 92 (Goldberg).

On May 14, 2010, the Trustee commenced this adversary proceeding by the filing of a Complaint against the Defendants, Edward Malley and Kablik & Leary, P.C., (hereinafter, "K & L"), Adv. ECF No. 1.[10]  Thereafter, on October 21, 2010, the Plaintiff filed a *Motion to (1) Cite in Additional Defendants and (2) Amend the Complaint*, which was granted by the Court on November 2, 2010, Adv. ECF No. 84.  The *Amended Complaint*, Adv. ECF No. 94 was filed with the Court on November 12, 2010.  Such additional Defendants included Scott LaBonte, Tracey Malley a/k/a Tracey Fyler, Deborah Bianca, SAL Cranston, LLC, SAL North Haven, LLC, RCZS, LLC, Devcon Manchester, LLC,

---

[9]The United States Trustee had refused to certify the election due to uncertainty as to whether the proposed trustee had received the necessary number of votes.

[10]References to "Adv. ECF No. _" refer to Adv. Pro. No. 10-2082.

Devcon Commons, LLC, the Edward Malley Revocable Trust[11] (hereinafter, the Malley Revocable Trust") and Laundry Express, LLC.  As noted *supra*, n.1, over the course of the adversary proceeding, claims against the vast majority of other defendants were resolved or severed from this case.  Trial on the Amended Complaint was held June 13, 14, 15, 22, and 23, 2011 (heretofore and hereinafter, the "Trial").  At the Trial, the Plaintiff prosecuted the First, Second, Fourth, Sixth, Eighth, Tenth,[12] Eleventh, Twelfth and Fourteenth Claims for Relief.[13]  The Court, *inter alia*, received documentary evidence and heard the testimony from a number of the Defendants and other witnesses.  Following the Trial, the Trustee filed *Plaintiff James Berman Trustee's Post Trial Brief*, (heretofore and hereinafter, "Trustee's Post Trial Brief") Adv. ECF No.446, Defendants, Edward Malley and Tracey

---

[11]The Malley Revocable Trust has not appeared in the proceeding by counsel nor has it filed an answer.  At the Trial, however, the attorney for Edward Malley entered into a stipulation with the Trustee respecting the the amount of the transfers it received.

[12]At p. 33, n. 8 of Trustee's Post Trial Brief, he states, "the Trustee is abandoning his constructive fraudulent transfer counts under the Bankruptcy Code and Connecticut Law and his claims under 11 U.S.C. § 549.  Thus, the Trustee withdraws and the Court need not adjudicate counts 3, 5, 7, 9, 13, 15 and 16 of the Amended Complaint."  While the Trustee does not mention count 10, the Court will presume his intent to abandon that count as well, since it only seeks to avoid a constructive fraudulent transfer under Conn. Gen. Stat. §52-552f(b).  Nor is this cause of action discussed in the Trustee's Post Trial Brief or Trustee's Reply Brief.

[13]More particularly, under the First, Second, Fourth, Sixth and Eighth Claims for Relief, the Trustee seeks the avoidance of alleged transfers made to Edward Malley under Code §547 (preference), §548(a)(1)(A) (intentional fraudulent transfer), §544(b)(1) and Conn. Gen. Stat. §52-552e(a)(1) (CUFTA intentional fraudulent transfer) and their recovery under Code §§550 and 551.  The Trustee seeks in the Eleventh Claim for Relief the avoidance of alleged transfers made to Devcon Commons, LLC, SAL North Haven, LLC, RCZS, LLC, Edward Malley and Tracey Malley under Code §547, (preference) and their recovery under Code §§550 and 551.  The Trustee seeks in the Twelfth Claim for Relief the avoidance of alleged intentional fraudulent transfers made to Scott LaBonte, Tracey Malley, the Malley Revocable Trust, Deborah Bianca, SAL Cranston, LLC, SAL North Haven, LLC, RCZS, LLC, Devcon Manchester, LLC, Devcon Commons, LLC and Laundry Express, LLC, under Code §548(a)(1)(A) and their recovery under Code §§550 and 551.  The Trustee seeks in the Fourteenth Claim for Relief the avoidance of alleged transfers made to Scott LaBonte, Tracey Malley, the Malley Revocable Trust, Deborah Bianca, SAL Cranston, SAL North Haven, RCZS, LLC, Devcon Manchester, LLC, Devcon Commons, LLC, and Laundry Express, LLC, under Code §544(b)(1) and Conn. Gen. Stat. §52-552e(a)(1) (CUFTA intentional fraudulent transfer) and their recovery under Code §§550 and 551.

Malley filed *Defendants Edward Malley and Tracey Malley's Post Trial Brief*, (hereinafter. "Malleys' Post Trial Brief"), Adv. ECF No. 471, Defendants' LaBonte, *et. al.*, filed *Post-Trial Brief of Defendants Scott LaBonte; SAL Cranston, LLC; SAL North Haven, LLC; RCZS, LLC; Chad LaBonte;*[14] *Devcon Manchester, LLC and Devcon Commons, LLC,* with Exhibits 1 and 2, (hereinafter, "LaBonte Defendants' Post Trial Brief") Adv. ECF No. 472, each with proposed findings of fact and conclusions of law.    Thereafter, the Trustee filed *Trustee's Post Trial Reply Brief* Adv. ECF No. 485 (hereinafter, "Trustee's Reply Brief"), subsequent to which, the LaBonte Defendants' filed a *Motion for Leave to File Surreply . . .* , which on November 17, 2011 the Court granted and further ordered that the motion serve as the surreply brief with no further brief to be filed, Adv. ECF No. 521.

## IV.  PROPOSED FINDINGS OF FACT

The Court's factual background is derived from the evidence adduced at trial, certain oral and written stipulations of the parties, the proposed findings of fact, and the Court's independent examination of the official record of the instant bankruptcy case and adversary proceeding.

## A.    *The Remaining Defendants in This Adversary Proceeding.*

Defendant Edward Malley (hereinafter, "Malley" or together with Tracey Malley, the "Malleys") is an individual residing at the time of Trial in Bolton, Connecticut.  His career occupation is as a small business owner, real estate investor and contractor.  He has also frequently traded in stocks on the stock market, including engaging for a time in day trading.

---

[14]As noted *supra* n.1, following the Trial, Chad LaBonte filed bankruptcy in Florida and judgment is no longer being sought against him.

Defendant Tracey Malley (hereinafter, "T. Malley" or together with Edward Malley, the "Malleys") is an individual and occasional private lender and investor, residing at the time of Trial in Bolton, Connecticut. She is married to Malley.

Defendant Scott LaBonte (hereinafter, "LaBonte") is an individual who is a cousin of Malley. At the time of the Trial and prior thereto, he was the President and Chief Executive Officer of Devcon Enterprises, a family - owned business that invests, develops and manages pharmacy and supermarket-anchored shopping centers. He is also an investor and manager in a number of other privately-held business ventures.

Defendant Deborah Bianca (hereinafter, "D. Bianca" or together with Paul Bianca, the "Biancas"), is an individual who was Malley's aunt through marriage. She is divorced from Paul Bianca (hereinafter, "P. Bianca") Edward Malley's uncle who is a settling defendant in the adversary proceeding.[15] Her last known address was Kensington, Connecticut.

Defendant SAL Cranston, LLC (hereinafter, "SAL Cranston") is a limited liability company organized in the State of Rhode Island. LaBonte is or was its managing member and its principal place of business is at 433 South Main Street, Suite 300, West Hartford, Connecticut. On February 25, 2009, a certain percentage membership interest in SAL Cranston was transferred from LaBonte to Malley as discussed *infra.*

SAL North Haven, LLC (hereinafter, "SAL North Haven") was a Connecticut Limited Liability Company of which LaBonte is or was its managing member and had its principal

---

[15]The Trustee entered into a formal settlement with Paul Bianca on September 20, 2011, which was approved by the Court on November 29, 2011 whereby he agreed, *inter alia*, to pay to the Trustee the sum of $100,000 in settlement of the Trustee's claim against him (which overlaps the claim against Deborah Bianca).

place of business at 433 South Main Street, Suite 300, West Hartford, Connecticut. On February 25, 2009, a certain membership interest in SAL North Haven was transferred from LaBonte to Malley as discussed *infra.*

Defendant RCZS, LLC (hereinafter, "RCZS") was a Connecticut Limited Liability Company of which LaBonte is or was its managing member and had a business address at 433 South Main Street, Suite 300, West Hartford, Connecticut.  The entity owned a corporate jet.  On February 1, 2009, a 20% membership interest in RCZS was transferred from LaBonte to Malley upon payment by Malley of $150,000 as discussed *infra*.

Defendant Devcon Manchester, LLC (hereinafter, "Devcon Manchester") is a Connecticut Limited Liability Company of which LaBonte is or was the managing member and has a business address at 433 South Main Street, Suite 300, West Hartford, Connecticut.

Defendant Devcon Commons, LLC (hereinafter, "Devcon Commons") is a Connecticut Limited Liability Company that has a business address at 433 South Main Street, Suite 300, West Hartford, Connecticut.  Its managing member is or was DevFresh, LLC, which, in turn, has or had LaBonte as its managing member.

Defendant Malley Revocable Trust has or had a business address at 171 Market Square, Suite108, Newington Connecticut and/or 92 North School Street, Manchester, Connecticut.  It was settled by Edward Malley, he is a trustee of the Revocable Trust and the principal and distributions therefrom are owned by and for the benefit and use of Edward Malley.

Defendant Laundry Express, LLC (hereinafter, "Laundry Express") whose managing member was Edward Malley, is or was a Connecticut Limited Liability Company that had

13

a business address at 92 North School Street, Manchester, Connecticut.  The Defendant operated a Laundromat at 238 Tolland Turnpike in Manchester, Connecticut.  Devcon Manchester was its landlord.

**B.      *The Parties Stipulate That the Debtors Operated a Pure Ponzi Scheme.***

The Plaintiff and remaining Defendants (other than D. Bianca who failed to appear at Trial), have verbally stipulated that the Debtors operated a pure Ponzi scheme that had no legitimate business purpose, and which the Court has accepted as an undisputed fact.  Tr. 6/13/11 at 11-12.  As described in the "Expert Report of J. Allen Kosowsky, CPA/ABV," (hereinafter "Kosowsky" or Kosowsky Report"), Pl. Ex. A, "the Debtors purported to provide consistent and unrealistic rates of return to investors through two types of business deals, either 'Diamond Liquidation Deals' or 'Chase Asset Deals.'"  Relevant to this adversary proceeding, are the Chase Asset Deals, that were "purported to be agreements whereby the Debtors had the contractual right [as evidenced by a fabricated "Chase Foreclosure Manifest"] to purchase foreclosed assets from Chase Manhattan Bank[16] that the Debtors would then sell, in prearranged sales, to large companies such as Bechtel Corporation, United Technologies, Bausch and Lomb, Inc., Swinerton Builders and others," Pl. Ex. A. p. 3. Goldberg explained to potential investors that the ability to buy the assets was only available to a few persons and his opportunity to do so arose because of his having a close relationship with a college friend and fraternity brother employed by Chase Manhattan Bank.

The investment agreements, (hereinafter, to be referred to as the "Agreement(s)") were

---

[16]See discussion of the Debtors' use of the name "Chase Manhattan Bank," *infra* n. 17 and n. 21.

characterized as between "Michael S. Goldberg representing Acquisitions Unlimited Inc.,"[17] and the individually named investors, and were titled, "Business Investment Agreement Form."[18]  Pl. Ex. 6-I.  Each Agreement acknowledged the amount of the investment, and specified that the funds were to be used "for the purchase of foreclosed and seized property for resale."  It further provided that upon the resale of the property the investors would receive back their initial investment plus a 20%[19] profit margin for the use of the "investment capital." Each Agreement was generally for a period of 90 days.  If Goldberg sought to change the 90-day repayment date, he was required to notify the investor in writing at least a month in advance.  If an investor wished to be repaid all or part of his investment at the end of the 90-day period, he was required to notify Goldberg 30 days prior to end of the current Agreement and thereafter, repayment to the investor was to be made on the 15th of the following month. In many instances, however, investors did not seek repayment at the end of the 90-day period but entered into one or more subsequent Agreements and reinvested all of the proceeds from

---

[17]The Agreements' characterization of Goldberg as "representing" Acquisitions Unlimited, Inc., created an ambiguity as to whether Goldberg, individually, was also intended to be a contracting party. Part of the ambiguity stemmed from the provision elsewhere in the Agreement, providing that Goldberg (without mention of Acquisitions Unlimited, Inc.) was guaranteeing the payment of taxes and fees.  *See infra* n. 19.  Additionally, the Agreement was signed by Goldberg, not by Acquisitions Unlimited, Inc. Finally, Jon Leary, Esq., (hereinafter, "Leary") the sole principal of K & L who represented Malley in certain of his other business activities (and later was himself an investor), testified that in 2005 when he was first shown the Agreement by Malley, he checked with the website of the Connecticut Office of Secretary of State and could not find any registration for Acquisitions Unlimited, either as a corporation or as an LLC. (Leary did locate a Michael S. Goldberg, LLC, however).

[18]The Agreement does not appear to be professionally drafted and the phraseology is awkward. For example, beneath the title appear the following sentences, "NOTE: The agreement to follow is a legal and binding agreement for both parties included. Any legal action to commence in regards to this agreement will require that the agreement be considered a legal contract."  As discussed in more detail *infra*, n. 21, each Agreement references "Chase Manhattan Bank" an entity that in the year 2000, five years earlier, had ceased to exist.

[19]In some instances, the so-called 'profit margin" for the 90 day loans was as high as 25%. *See* Pl. Ex. 7E, Agreements between Goldberg and Malley dated 3/31/06, 7/1/06, 10/1/06, 1/1/07, 7/1/07, 10/1/07, 1/1/08, 4/1/08 and 7/1/08).

the earlier investment so that the profits earned during the prior period would be compounded in the next. Thus, the effective annual returns for some investors could be substantially in excess of 100%. Further, the Chase Asset Deals were described in the Agreements as tax-free[20] and risk-free.[21]

As noted earlier, the "Chase Asset Deals" were complete fabrications of the Debtors. "There is no evidence of any monies being provided to the purported sellers (i.e., Chase Manhattan Bank . . . in New York City)[22] in these fraudulent Agreements, nor is there evidence of any receipts from the purported purchasers of the goods. . . . In fact, based upon [Kosowsky's] review of bank statements used by the Debtors for these purported ventures, the only financial transactions that occurred were those between the Debtors and the investors. None of the transfers were in furtherance of any legitimate business purpose. All transfers to investors were made with monies received from other investors." Kosowsky Report, Pl. Ex. A, p. 3.

Many of the investments with Goldberg came through "feeders" who solicited

---

[20]Each Agreement stated "all taxes or fees regarding transaction will be paid for by Mr. Goldberg."

[21]Under a section of the Agreement marked "**NOTE**" it awkwardly stated, "[t]he security of the principal amount is ensured thru a buy-back clause with Chase Manhattan Bank that if contract is canceled or is discontinued for any other reason that the principal of each investor is maintained. All that will be lost is the opportunity cost for that 90-day period contract."

[22]In December 2000, the Chase Manhattan Bank acquired J.P. Morgan and Co., and as a combined company was renamed JP Morgan Chase. Its current logo which is just the word "CHASE" in solid black letters followed by a blue octagon has been in use since 2005. But the formal use of the name Chase Manhattan Bank as a part of the logo actually ceased years earlier. A copy of an unsigned "CHASE" document dated December 10, 2006, purporting to be an "Addendum" to the "subcontractor/vendor registration information and agreement," adding a "Contract Dissolution Capital Protection Clause" (hereinafter, the "Letter Addendum") given to Malley by Goldberg and intended to evidence his ongoing relationship with Chase, as well as support his claim that the investment was "risk-free," had the octagon on the wrong side of the CHASE name. It also had printed at the bottom of the document the name "Chase Manhattan Bank." Def. Ex. 3.

investments from friends and relatives, bundled the investments from these third parties together and either directly or indirectly paid them over to Goldberg. In some instances, Goldberg compensated these "feeders" through the payment of a "finder's fee." In other instances, Goldberg paid nothing and a loan fee was charged by the "feeder" which fee was taken out of the third party's funds before the balance was paid over to Goldberg for his use.

Where necessary to respond to an investor who raised questions about his business affairs, Goldberg created false documents including inventories, manifests, bank statements, bank checks, contracts, business cards and letterheads, all intended to convince the investor of the legitimacy of his business operations. On more than one occasion, he obtained the assistance of third persons to pose as the employees of companies with which he claimed to be doing business.[23] Finally, in November 2009, at a time when Goldberg was having difficulty raising the funds necessary to pay off earlier investors, many of whom were pressuring him for payment, and the number of new investments were dwindling, he voluntarily turned himself in to the Federal Bureau of Investigation.

## C.     The Investors.

Malley first became aware of the Goldberg investment deal in 2004 either through his brother, Michael Malley or his brother's ex-wife, Judy Malley. Judy Malley had been investing with Goldberg for several years and Malley understood through conversations primarily with his brother that she had not encountered any problems with her investments. Sometime thereafter, Malley and T. Malley met personally with Goldberg and he explained to them the nature of his Chase Asset Deals. Mr. Goldberg told them that he was able to do these

---

[23]*See infra* n. 23.

transactions because he was one of just a few people that were allowed to buy foreclosed equipment from Chase Manhattan Bank at very low prices which allowed him to run these transactions at a profit to himself of almost 200 percent and which, therefore, allowed him to offer the Malleys either a 20 or 25 percent return on their investment each quarter.

Thereafter, in April 2005, Malley made his first investment with the Debtors on the terms set forth in the Agreement.[24]  T. Malley made her own first investment with the Debtors in the amount $23,000 at about the same time.  T. Malley invested additional sums directly with the Debtors for a total of $50,000, with the last amount invested in early 2006.  Her Agreements provided that she would receive a 20% return on her investment every 90 days, the tax for which would be paid by Goldberg.  She testified that she did not believe such a

---

[24]It was not until sometime in the latter part of 2006 after Malley had begun investing with Goldberg that he sought to verify the accuracy of certain terms in the Agreement, in particular, the "buy-back" clause.  So as to assuage any possible concern, Goldberg gave Malley a copy of the Letter Addendum.  However, as noted *supra* n. 21, not only was the Chase logo misplaced on the Letter Addendum, but it misspelled the word surety as "surity" and as with the Agreements, was poorly written, containing obvious grammatical errors.  The clause itself stated, "For if any of reasons in above mentioned criteria or of similar classification cause for cancellation of contractual agreement between Michael S. Goldberg . . . and any designated parties original purchase price for product from manifest in its entirety will be refunded via wire transaction or certified check within 30 days of submittal of dissolution of purchase agreement."  Finally, the party allegedly contracting with Chase Manhattan Bank was "Michael S. Goldberg LLC - DBA Acquisitions Unlimited Group," different from the party with whom the investors entered into the Agreements. (Def. Ex. 3) After examining the Letter Addendum, Malley questioned why the letter was unsigned and no one by name from the bank was identified on the document.  Although Goldberg gave an ambiguous answer at the time and Malley testified he thought it was "odd," he was nevertheless satisfied when he received a "signed" copy several weeks later.  Tr. 6/14/11 at 138-139.  While thereafter he sought to contact someone at Chase to verify the legitimacy of the buy-back clause, he testified he was never able to reach anyone to verify it.

Several years later, in September 2009, when Malley, along with Leary and LaBonte were questioning Goldberg about the delay in payments to them, Goldberg called someone who falsely represented himself to be Frank Foellner of Swinerton Builders, one of the so-called buyers of the repossessed property.  This "Frank Foellner" explained the reason for the late payments but sometime thereafter, when one or more of them attempted to telephone this "Frank Foellner" back, the callers were unable to reach him.  No one pursued the matter further.  Prior to that time, the three had not tried to contact any of the so-called buyers because as early as 2005, Malley was told by Goldberg and later shared by Malley with the others, that Goldberg did not want anyone but himself to contact them, in part because of Goldberg's supposed concern that others might try to steal his business.

return on a private investment was unusual and also testified to her belief that the investment was virtually risk-free because of the "buy-back clause" in the Debtors' contract with Chase.[25] She did not however, pursue confirmation from any third parties as to the accuracy of any of Goldberg's representations.

At no time prior to making their first investments nor at any time thereafter, did the Malleys speak to the Debtors' accountant or attorney about the business operations or obtain any supporting documents from them.   Tr. 6/13/11 at 263-265. Although on occasion thereafter, Malley, along with Leary, requested from Goldberg an opportunity to examine his tax returns and/or financial statements, they were never provided. *Id*. Leary, Malley's friend and attorney of about fourteen years duration, testified that he was never expressly asked by Malley to evaluate the advisability of the initial investments, Tr. 6/13/11, at 169-170.[26]  Nor was he asked by Malley to verify Goldberg's background or education.  Tr. 6/13/11 at 173. Nevertheless, at some time between 2005 and 2006 he did express his concern to Malley about the Agreement's questionable representation that the Debtors would pay the Malleys' taxes,[27] and told him of his discovery that Acquisitions Unlimited was not a registered LLC.

---

[25]Although she testified she thought the 20% quarterly returns on the Goldberg investment were not unusually high, when questioned about her returns on other unsecured loans she had made, she testified that she had received "Ten, 8, 15 percent."  She later amended her answer to conform with her earlier deposition at which she testified that the highest return she had ever received was 10% *a year*. Tr. 6/22/11 at 90, 94.

[26]While Malley testified that he had sought advice, such testimony was made questionable by other testimony given by him:  The Court: "You had business relationships with [Leary] in which you paid him a fee for his services; is that correct?" The Witness: [Malley] "Correct."  The Court: "Did you pay him a fee in connection with whatever advice you think you sought from him with regard to this transaction?" The Witness: [Malley]: "No."  Tr. 6/14/2011 at 251.

[27]Notwithstanding their awareness of this provision, both Malleys testified that they were never asked to give their social security numbers to Goldberg and admitted that to the best of their knowledge Goldberg never paid any taxes on their behalf.  There was no evidence that they ever questioned

19

Leary also expressed concern about the unprofessional manner in which the Agreement was drafted and the fact that it offered such unusually high rates of return.   Nevertheless, beginning in April 2006, apparently overcoming his concerns in light of the extraordinary returns he saw being made by Malley, Leary made "loans" to Malley for investment with Goldberg.[28]

Between July 15, 2005 and September 16, 2008, Malley directly invested $1,285,000 with the Debtors.  Combined with the investments he solicited as a "feeder" from third parties, he turned over to the Debtors through a K & L IOLTA Trust Account[29] (hereinafter, the "IOLTA Account") that was managed by Leary on behalf of Malley, a total of $3,934,500, with the last investment made September 18, 2009.  Once Malley began to act as a "feeder" and for a fee invested money given to him by others, he testified that he ceased investing his own money, Tr. 6/15/11 at 50-51.  Malley testified to his belief that his last investment was at the end of 2007.  Tr. 6/14/11 at 210.  Therefore, he was able to draw out the principal amount of his investments from the first payments he received from the Debtors.  Tr. 6/15/11 at 51.

In the two year period beginning December 18, 2007, through the end of September 22, 2008, Malley received $1,871,720.77 directly from the Debtors as a return on his

---

Goldberg about the matter although they were told not only by Leary but also by the Malleys' accountant that it was not possible to fully pay another person's taxes.  (As noted by Kosowsky, testifying for the Plaintiff as an expert in forensic accounting, if someone paid tax on your behalf, that would be income to you and then that itself would trigger another income tax liability).  Nor did the Malleys ever receive an IRS Form 1099 from Goldberg.

[28]A year or two later, beginning in early 2008 when Leary, on behalf of himself and a cousin began to directly invest with Goldberg, he and Malley would meet every few months with Goldberg and discuss the investments and look at alleged business documents brought to the meeting by Goldberg.  Tr. 6/13/11 at 170.

[29]See discussion of IOLTA Account, *infra*, n. 29.

investments.  During the years 2008 and 2009, T. Malley received $128,416.29 directly from the Debtors as a return on her investments.  However, the vast majority of payments from the Debtors to Malley was made through the IOLTA[30] Account.  According to Leary, Malley initially decided to funnel the funds through the IOLTA Account so that he could take profits from his real estate investments and transfer them to the Debtors.  Later, when Malley began to work as a "feeder," he again asked Leary to allow money to be deposited there.  As the amount of business with Goldberg grew, Malley wanted the money to all flow through the IOLTA Account so that he could keep track of the money and for Leary to help Malley with his tax reporting obligations.  Although Malley received his first direct repayment from the Debtors on August 10, 2007, and a number of others thereafter, by July 17, 2008, the vast majority of payments from the Debtors were being made through the IOLTA Account.

Thus, between July 17, 2008 and November 4, 2009, the Debtors transferred $12,366,000[31] to Malley's IOLTA Account which was then disbursed either to Malley or, at his direction, to his wife or third parties who had earlier transferred money to him for investment

---

[30]IOLTA is an acronym for Interest on Lawyers' Trust Accounts.  Black's Law Dictionary (9th Ed. 2009).  It is further defined in the Connecticut Rules of Professional Conduct, Rule 1.15(a)(4) as "an interest or dividend-bearing account established by a lawyer or law firm for clients' funds at an eligible institution from which funds may be withdrawn upon request by the depositor without delay. An IOLTA account shall include only client or third person funds," [subject to certain exceptions not relevant here]. Rule 1.15(e) provides that "[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person" and further, [subject to exceptions not relevant here] "shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."  The Official Commentary to Rule 1.15 notes that "[a] lawyer should hold property of others with the care required of a professional fiduciary."
    Connecticut Rules of Court, Sec. 2-27(a) provides, "[c]onsistent with the requirement of Rule 1.15 of the Rules of Professional Conduct, each lawyer or law firm shall maintain, separate from the lawyer's or the firm's personal funds, one or more accounts accurately reflecting the status of funds handled by the lawyer or firm as fiduciary or attorney, and shall not use such funds for any unauthorized purpose."

[31]The Plaintiff has conceded that approximately $150,000 of other money deposited into the IOLTA Account during that time may be unconnected to the Debtors.

21

with the Debtors. In addition to the transfers made by the Debtors into the IOLTA Account, in many instances, when Malley received direct payments from the Debtors, he turned those funds over to Leary for deposit into the IOLTA Account. As a consequence, the total amount of money disbursed from the IOLTA Account was $13,161.741.67, an amount that exceeded the amount transferred by the Debtors into the IOLTA Account.[32] That included $7,241,797.52 paid over to LaBonte, and $667,500 to the Malley Revocable trust.

As stated above, for her $50,000 investment with the Debtors, T. Malley received directly to her from them, two payments, one for $70,000 and another for $58,416.29. She received additional transfers of funds from the IOLTA Account as directed by Malley, totaling $918,566 in 2009. Further, a transfer from the IOLTA Account to Miller Motor Cars in the amount of $144,566.50 (including a $5,000 deposit) was made for the purchase of a 2009 Maserati motor vehicle for T. Malley. The final four disbursements from the IOLTA Account authorized by Malley, totaling $229,000 to T. Malley, occurred in December 2009 and February 2010, a period after the bankruptcy filing and after it was publicly known that Goldberg had been running a Ponzi scheme.[33]

Notwithstanding her receipt of more than $900,000 in 2009, T. Malley did not report

---

[32]The Plaintiff was unable to fully account for all of the checks sent by the Debtors directly to Malley that were then signed over by him to the IOLTA Account in the amount of $795,000. Pl. Ex. 12-Z, Tr. 6/13/11 at 79-82. Kosowsky testified that a remaining discrepancy of $200,000 existed because in some cases the Trustee had not received both sides of checks sent to Malley so that Kosowsky could not fully to verify that the remaining checks were endorsed over to the IOLTA Account.

[33]Q: Q: "You directed Kablik & Leary to make these transfers to your wife in the amount of $229,000 after you knew that the funds sitting in the Kablik & Leary IOLTA Account were the result of a Ponzi scheme operated by Mr. Goldberg. Correct?" A [Malley]: "Correct." Tr. 6/14/11 at 228. Malley also directed post-petition, post-arrest, payments be made to RCZS of $20,000, to K & L of $8,000, and to the Malley Revocable Trust of $5,000. Tr. 6/13/11 at 277-278; Kosowsky Report, Pl. Ex. A, Schedule 7b.

this income on her income tax returns for the year, testifying that the money she received from the IOLTA Account was actually her husband's, that it was wired into her account for payment of "monthly expenses" and that therefore, her husband would pay the tax due on the money in his own tax returns.[34]  She admitted however, that as of June 22, 2011, the date of her Trial testimony, Malley had not yet filed his 2009 income tax return.  Nor did she pay tax on the $58,416.29 she received as repayment of what she conceded to be her actual investment with the Debtors because as she testified, she believed that Goldberg had paid the taxes for her, even though by April 13, 2010, the approximate date her return was filed, she was aware that Goldberg had been arrested for operating a Ponzi scheme.  She also chose not to inform her accountant about her receipt of the moneys either from the Debtors directly or through the IOLTA Account.

Leary testified that at the time disbursements began to be made out of the IOLTA Account he did not believe there were any funds in the IOLTA Account other than funds received from the Debtors (except for possibly $150,000 that might have been his own funds). Tr. June 13, 2011 at 175-177.  Leary testified that he always verified the receipt of funds with Malley and awaited Malley's direction before any funds were disbursed from the IOLTA Account, including payment of his own fees. Tr. 6/13/11 at 212-213.  Thus, the transfers were all treated by Leary as funds belonging to Malley or funds being held for the benefit of Malley.

It was in 2006, when Malley first became a "feeder" for the Debtors, permitting and/or soliciting other persons to enter into financial transactions with him for the purpose of his

---

[34]The 90 day Agreement she entered into with Goldberg dated January 1, 2008, indicated an outstanding loan amount of $406,257.86 which consisted of her original investment rolled over for almost three years.  It promised a 20% return on investment in 90 days requiring a payment to her of $487,509.43.  Assuming the Debtors did not actually pay the loan off until the following year, their indebtedness to her debt could have risen to about a million dollars.

23

investing those funds with the Debtors, minus his fee.  Some investments came from family and friends with whom he discussed the business opportunity he had in detail.  Others were solicited through more general descriptions of certain private investment opportunities available to them.

One particular solicitation, which occurred between January and February 2008, was made by Malley to Robert Gengras, an acquaintance of his whom he tried to convince to invest.  Part of the effort to convince him consisted of the presentation to Gengras of an opinion letter dated February 12, 2008, prepared by Leary at Malley's request in which Malley is described in several places as a "partner" in a private investment matter which clearly referred, without naming him, to Goldberg.[35]  Malley testified that the opinion letter was prepared because Gengras told him that although he did not have any available funds to invest, he had friends who had the resources to invest and with the opinion letter he might be able to generate interest.  That way, he also could profit from the investment.

Malley also shared with Gengras an unsigned information sheet that described the nature of the investment that he was soliciting Gengras to join.  Throughout the information sheet were references suggesting that Malley was a partner in this investment.[36]  The information sheet contained many other falsehoods, as well.  For example, one sentence

---

[35] Among other representations in the "Opinion" letter is that "the private investment is operated by a limited liability company. . . in good standing under the laws of . . . Connecticut"; "Mr. Malley and his partner . . . possess all licenses and permits to conduct business"; and "based on inquiry of Mr. Malley and his partner, Mr. Malley and the investment are in compliance with all federal, state and local laws . . . related to the conduct of its business and affairs." Pl. Ex. 5-N.  Malley testified that he gave Gengras the letter even while knowing that it contained incorrect information. Tr. 6/14/11 at 172-173.

[36]Throughout the information sheet are sentences beginning, "*Our* business"; "*We* receive a manifest," "*Our* successful relationship."  The information sheet ends with this sentence, "Many contractors *we* have relationships with have also become certified contractors in this regard, which will allow *us* to continue *our* relationship for the foreseeable future." Pl. Ex. 5-P (emphasis added).

states, "Since we have been in business for 10 years, we have developed ongoing relationships with large contractors." Not only hadn't Malley been in business with Goldberg for ten years but he admitted that he hadn't even known him for ten years. Tr. 6/14/11 at 185. The information sheet also stated, "We have applied for and been accepted as a certified vendor in connection with the New Orleans reconstruction, enabling the company to sell goods to certified contractors." Malley admitted that was false as well. Tr. 6/14/11 at 187. At some point, Gengras met with Malley, Leary and Goldberg. He testified they told him that he could make a profit of three times his investment over a period of six months to a year. Tr. 6/15/11 at 219-220.

Ultimately, however, Gengras decided not to get involved with Goldberg. Over his more than 25 year career, Gengras had been involved in numerous business ventures including a school bus company and the building of a luxury hotel. It was his testimony that being promised such high returns concerned him. He testified, "it just turned into too cloudy, too shady. I don't understand why he would be asking me if this thing was such a great deal." "Q. And did the rates of return seem suspicious to you? A. Yeah. They were — completely fairy dust." Tr. 6/15/11 at 221. Further, in considering the investment, he had also spoken to LaBonte, a golfing buddy, who he had been told by Malley was also an investor. LaBonte, while stating that he had "invested with Goldberg," Tr. 6/15/11 at 228, discouraged Gengras from investing himself, telling him not to put all his eggs in the same basket. Tr. 6/15/11 at 217. Gengras testified that he took that as a "kind of warning." Tr. 6/15/11 at 232. LaBonte further told him that he was "out of the investment." Tr. 6/15/11 at 231. Gengras summarized his reasons for choosing not to invest by stating, "I had a lot of negatives to begin with, . . . all the secrecy and . . . no hard data, no clear-cut names, ranks, serial number, type of thing."

25

Tr 6/15/11 at 232.

Although approximately forty-seven persons ultimately paid money over to Malley, not all of the transactions were conducted in the same manner. While the money invested by Leary with Malley from 2006 through early 2008 totaling $100,000 was returned to Leary in an amount equal to what Malley received in repayment from the Debtors (1.3 million dollars), with Malley collecting no fee, and Leary understood repayment was dependent upon there actually being a profit on his investment with the Debtors, in other cases, the money invested was treated by them as loans directly to Malley and Leary, which each used for his own purposes, allowing them to leave their own funds invested longer with the Debtors.[37]

The financial transactions with most of Malley's investors, took the form of simple promissory notes of one year in length which set forth the amount lent and promised repayment no later than a year later with interest in amounts that ranged from 13% to 40%. The notes could be prepaid without a penalty, and in most cases provided that they would be construed and governed by the laws of the state of Nevada. The notes did not require that the moneys received be invested with the Debtors although, in most cases they were paid into the IOLTA Account for investment with the Debtors. Nor did the notes detail the loan fee that was extracted by Malley from the amount lent. There was no evidence that the Debtors also paid Malley a fee for arranging these loans. Malley's cut came from the difference between the more moderate interest he paid the investors *yearly* and the very high interest he earned *quarterly* from investing the same funds with the Debtors.

---

[37]Malley testified that the money received from one investor, Frank Mete, an acquaintance of Leary, was divided up between him and Leary for their own use, and repayment was not dependent upon their recovery of profits from the Debtors.

26

Some notes were of a slightly different variety.  On April 4, 2007, D. Bianca with her then husband P. Bianca, lent to Malley the total sum of $400,000 in exchange for which they received a promissory note due and payable to the Biancas on or before April 4, 2008 and carrying interest at an annual rate of 20%.  Pl. Ex. 9-H.  The note was signed both by Malley, individually, and by Malley as managing member of the businesses Laundry Express and Laundry Express II, LLC.  The note indicated that it was to be construed in accordance with the laws of the State of Connecticut.  There was no indication on the note that the funds were to be invested with Goldberg, just that they were to be used for commercial purposes.  However, as additional security for the loan, Malley entered into a Security Agreement with the Biancas in which he pledged as security the assets of Laundry Express and Laundry Express II, LLC, subject to preexisting liens.  Pl. Ex. 9-I.  Additionally, on Schedule A of the Security Agreement Malley pledged as security for the loan"[a]ll assets held by Michael Goldberg/Acquisitions Unlimited located in Wethersfield, CT," which Leary, as the drafter, testified was his inartful way of trying to pledge Malley's investments with Goldberg in favor of the Biancas.

Malley testified that he told his Uncle Paul that the money was going to be invested in the acquisition and sale of foreclosed assets but did not identify Michael Goldberg or the specific details of their arrangement.  Nevertheless, P. Bianca and D. Bianca must have had some detailed knowledge about the proposed investment since the security agreement pledged the assets of "Michael Goldberg/Acquisitions Unlimited. . . . "

One advance repayment on the Note was made by check in the amount of $6,600 to D. Bianca from the IOLTA Account shortly after the Note first became due, which the Plaintiff is not seeking to recover.  The balance of the Note was paid on November 3, 2008 from the

27

IOLTA Account in one check for $520,066.66, payable to Timothy Sheehan, D. Bianca's divorce attorney, on behalf of D. Bianca.  Thereafter, the funds were disbursed to her as agreed upon by the Biancas in connection with their divorce.  It is this payment that the Plaintiff is seeking to recover as a fraudulent transfer.

Malley received the largest influx of money for investment from LaBonte.  During various lunches together in 2005, Malley explained to LaBonte with whom he was "close," the details of his investment with the Debtors and asked him if he would be interested in investing.  Malley told him that he was enjoying rates of return by his calculations of 80 to 85%.  Tr. 6/15/11 at 169.  LaBonte was advised about the business model and Malley testified that LaBonte trusted Malley's judgment that the investment was "on the up and up."  Tr. 6/14/11 at 128.  LaBonte also testified that he did little "Due Diligence" of his own.[38]  Tr. 6/15/11.  Nevertheless, prior to making his first investment, he did ask to see some verification that Mr. Goldberg had the relationship with Chase Manhattan Bank as represented and sought verification of the contract with Swinerton.  The only verification he received however, was a copy of the Letter Addendum, containing the "Contract Dissolution Capital Protection Clause," the one also shown to Malley and which, as described *infra* n. 21

---

[38]The elements of "due diligence" were explained by Kosowsky as follows: first, review the business plan – that would include information such as the business activities, the expected results, the risks involved, financial information in the form of projections, and assumptions that could be tested. Secondly, for an ongoing business "due diligence" would also include access to tax returns for the entity as well as at minimum, a "review level" financial statement prepared by a certified public accountant, ["review level," meaning going beyond a mere compilation in that the accountant is required to perform analytical procedures on the balances in the financial statements that "provides a user with comfort that, based on the accountant's review, the accountant is not aware of any material modifications that should be made to the financial statements for the statements to be in conformity with the applicable financial reporting framework."]  American Institute of Certified Public Accountants (AICPA), www.uacpa.org.]. Finally, Kosowsky stated that "due diligence" would require looking at key documents and contracts between customers and the venture and from a legal point of view, making sure the entity was properly organized and registered.

and n. 23, contained *inter alia*, misspellings and ungrammatical phraseology, Def. Ex. 3; Tr. 6/15/11 at 174.  LaBonte could not recall whether the copy he saw had a name or signature on it, Tr. 6/15/11 at 176.

Beginning on or about January 16, 2006, LaBonte invested money through a series of six promissory notes executed by Malley.[39]  Pl. Exs. 7-F, 7-G, 7-I, 7-J, 7-K and 8-R. Although at Trial, LaBonte claimed that he never invested with the Debtors, but was simply making a loan to Malley, prior to executing any of the notes he never asked Malley for financial statements or tax returns, or for other documents that would have established Malley's ability to repay the notes.  Tr. 6/15/11 at 172.  Unlike some of the other investors, all of the money he turned over to Malley was invested with Goldberg.  Additionally, unlike the other investors, the promissory notes Malley signed (except for the first note) set out in bold and highlighted type that the funds could "only be utilized for an investment in Acquisition Unlimited LLC for business or investment activities . . . ."[40]  The notes were also worded differently from those between Malley and others who invested with or through him.  The first note, prepared by LaBonte's attorneys Levy & Droney, provided for an annual return of 12% but required repayment of the note 45 days from the date the note was made.  It also required the payment of a loan fee of $10,000 for use of the money over those 45 days.  Unlike the later LaBonte notes, it stated that the note was to be governed by the laws of the State of

---

[39]The Trustee claims in the Trustee's Post Trial Brief that LaBonte did not prove that the funds contained in the six notes (minus the loan fees) were actually paid over to Malley.  *But see* discussion *infra*.

[40]LaBonte testified that the language was included in the Malley notes so that "he would put the loan into the investment that it was intended for and not use it for any other means, just put it in what was supposed to be the appropriate investment." Tr. 6/22/11 at 97.  Note the sloppy dropping of the "s" in Acquisition.  The notes LaBonte signed with his own investors similarly omitted the "s."

Connecticut.[41]  Thereafter, although all of the notes continued to be executed in Connecticut, LaBonte chose upon the advise of his attorney to have the notes governed and construed under Nevada law so as to avoid violating Connecticut usury laws.  LaBonte's investment with Goldberg through Malley was also beneficial to Malley because even with all the other people set to profit, he also expected to recover 20 or 20% a quarter from the LaBonte investments. Tr. 6/14/11 at 157.

Repayment of the first note was timely.[42]  Subsequent to his making that first investment, LaBonte, wanting to know more about the use to which his money was being put, attended a dinner meeting with Goldberg, also attended by Malley.  Tr. 6/15/11 at 178-179. At the dinner, Goldberg explained to LaBonte about his business,[43] purchasing foreclosed assets at a deep discount, but LaBonte did not request nor did Goldberg offer to provide LaBonte with any supporting financial statements or tax returns.  Tr. 6/15/11 at 179-180. LaBonte did not seek further information from Goldberg's unidentified accountant or attorney nor, for that matter, from his own attorney or accountant.  At the Trial, Mark Legoski, who was Goldberg's personal accountant during this period of time, testified that he was never contacted by Malley, LaBonte or their accountants concerning the investments with the Debtors.  Tr. 6/22/11 at 192.  He also testified that in preparing Goldberg's 2006 and 2007 returns he was never told about either Acquistions Unlimited or Michael S. Goldberg, LLC, and nothing was included in those tax returns in connection with those businesses.  Tr.

---

[41]The first $500,000 note dated September 28, 2006 also applied Connecticut law but when the note was restated as of January 1, 2007, it was governed by Nevada law.

[42]It proved to be the only one that was. *See* Tr. 6/15/11 at 159-160.

[43]Goldberg also disclosed that he was employed full-time as a medical equipment sales representative and had a start-up business representing musicians.

6/22/11 at 187-189.  It was not until 2009 when he was preparing Goldberg's 2008 tax return that he became aware of his connection with Acquisitions Unlimited.

Following repayment of that first note, the five later Malley/LaBonte notes were for much larger sums and following repayment of the first note, LaBonte told Malley that he was going provide him with money to invest with the Debtors.  LaBonte testified to his belief that there was an investment opportunity that he wanted to take advantage of and agreed to do so through Malley.  As a result, as noted above, each of the later notes after the first, contained the provision that the funds had to be invested with "Acquisition" Unlimited. However, as with Malley's own later investments with Goldberg, only three of the LaBonte investments were made with his own money.  He too became a "feeder" and invested money that was loaned to him by third parties.  Without Malley's knowledge, at least initially, LaBonte began to solicit family and friends to provide him with money for the purposes of investing the funds with the Debtors through Malley.  As testified to by LaBonte, borrowing the money from third parties made it a lower risk investment for him. Tr. 6/15/11 at 200.

The six Malley/LaBonte notes can be described as follows: one dated January 16, 2006 in the principal amount of $100,000 consisting of his funds; one dated September 28, 2006 in the principal amount of $500,000 as amended and restated on January 1, 2007 and consisting of his funds; one dated January 1, 2007 in the principal amount of $900,000 consisting of funds received from four other individuals; one dated April 4, 2007 in the principal amount of $350,000 consisting of funds received from two other individuals; one

entered into on or about July 2, 2007[44] in the principal amount of $500,000 consisting of funds received from two other individuals and one entered into on or about October 11, 2007 in the principal amount of $700,000 consisting of his own funds.  LaBonte made no further advances of funds to Malley after this last note was executed.

According to the terms of the $500,000 note dated September 28, 2006, as amended and restated as of January 1, 2007, it was due to be paid off upon demand within 30 days after October 12, 2007 and provided for annual interest of 40%.[45]  Similarly, with respect to the $900,000 note dated January 1, 2007 and which fell due January 1, 2008, the terms required an annual interest payment of 25% plus a loan fee to LaBonte of $180,000, payable immediately upon execution of the note to him out of the $900,000.  The four persons who contributed the funds that made up the investment received their 25% annual return at the time the note was paid off.  The note for $350,000 dated April 4, 2007, the funds for which came from two individuals, fell due April 1, 2008, also required an annual interest payment of 25% and a loan fee payable to LaBonte upon execution of the note in the amount of $70,000.  The note for $500,000 dated July 2, 2007, the funds for which came from two individuals, fell due July 2, 2008, again required an annual interest payment of 25% and a

_____

[44]While as the result of Defendant oversight, this note was not admitted into evidence, there was sufficient other evidence introduced at trial, to support its existence.  In particular, the Plaintiff entered into evidence Pl. Exs. 8-T, 12-F and 12-Y, which together referenced the note, the principal amount of the note ($500,000), the interest rate (25%), identified the participants in the note and the balance due as of October 20, 2008.

[45]Other than the $100,000 45 day loan, this was the first note due and payable.  However, notwithstanding a demand letter sent to Malley requesting full payment no later that January 15, 2008, of what then amounted to a debt of $784,383.20, Malley made only a partial payment of $250,000 on January 16, 2008 and another partial payment of $20,000 two weeks later.  With additional interest due by the date of a subsequent demand letter sent March 21, 2008, Malley still owed $650,000 on that first note. LaBonte testified that as time went on Malley also had difficulty in making timely payment on all of the other outstanding notes.

loan fee payable to LaBonte upon execution of the note in the amount of $100,000. The October 2007 note for $700,000 provided for annual interest at 30% with a loan fee in the amount of $140,000 immediately payable to LaBonte upon execution of the note.

As with the Goldberg/Malley notes, the Malley/LaBonte notes provided that Malley would pay "all taxes levied or assessed upon the [repayment amount] against the payee or the holder of this Note. . . ." There was no evidence presented at the Trial indicating that either LaBonte ever attempted to enforce the payment of taxes provision against Malley or that Malley ever attempted to or paid LaBonte's taxes. Totaling the principal amount of the notes (and excluding the first $100,000 note which the Trustee is not seeking to recover) and subtracting out the loan fees, leaves an original investment by LaBonte of $1,960,000.[46]

As noted above, much of the money LaBonte invested with Malley came from his own lenders. Similar to the Malley/LaBonte notes, the notes LaBonte gave to his lenders contained language stating, "[t]he funds received pursuant to this note shall only be utilized for an investment in "Acquisition" Unlimited, LLC." Pl. Ex. 8-U. LaBonte required that language so as to mirror the notes he signed with Malley and so it was clear to his lenders the use to which the funds were to be put. These notes also contained the offer that LaBonte would pay "all taxes levied or assessed upon [the prepayment amount] against the payee or holder of this Note. . . ." *Id.* As with the Malley/LaBonte notes, no evidence was presented suggesting that LaBonte's lenders ever attempted to enforce the payment of taxes provision

---

[46]The calculations are as follows: $900,000 (restated loan of January 1, 2007) minus $180,000 loan fee= $720,000; $350,000 (loan of April 4, 2007) minus loan fee of $70,000 = $280,000; $500,000 (loan of July 2, 2007) minus loan fee $100,000 = $400,000; $700,000 (loan of October 2007) minus loan fee of $140,000=$560,000.

against LaBonte.

Likewise, as with most of the Malley/LaBonte notes, each provided that they were to be construed and governed in accordance with the laws of the state of Nevada. LaBonte testified that he explained the nature of the Goldberg business plan and Malley's involvement with it to each of his prospective lenders, as it had been explained to him by Malley and as Goldberg had explained to Malley. Tr. 6/15/11 at 239-240. He stated that his investors must have all relied on his representations in deciding to loan him the funds since he did not show them any supporting documentation. Pl. Ex. TT pp. 242-243.

LaBonte received no repayments directly from the Debtors but received payments on his notes from the IOLTA Account as directed by Malley to Leary. LaBonte never directed Leary upon receipt of money from the Debtors to place his money in the IOLTA Account and then pay it over to him. Nor did he tell Malley that he wanted repayment to come from the IOLTA Account. When LaBonte received a payment from Malley, LaBonte would, in turn, pay the sum received to his own lenders when payments were due, to the extent the payments from Malley were made timely.

Neither Malley nor many of his investors pursued substantial repayment of their investments until 2008. On the other hand, LaBonte sought repayment of his investments as soon as the notes fell due in 2008. Tr. 6/15/11 at 47. However, when Malley and LaBonte each sought repayment they found that payments due from the Debtors were frequently late and were usually made in amounts less than what was due. By the Fall of 2008, Leary was sending e-mails to Goldberg expressing concern over the delay in payments which, from the anxiety evidenced in the correspondence, suggests the delays had been occurring over a considerable period of time prior to the November 5th e-mail. Pl Ex. 5-F. Malley began

34

calling Goldberg almost daily, Tr. 6/14/11 at 207, and at one point threatened to sue him.  Tr. 6/14/11 at 213.  Because LaBonte was dependent upon Malley being paid before he could be paid, LaBonte also became increasingly concerned over the delays and began to contact Malley with greater frequency.  LaBonte's concern over the safety of the investment was already evident when he was approached by Gengras back in January or February 2008, following Malley's solicitation of Gengras as an investor.  As noted *supra*, not only did he discourage Gengras from investing with Goldberg but he also told him that he was "out" of the investment.[47]  Nevertheless, no evidence was presented to suggest that LaBonte ever asked Malley to repay the investments himself, notwithstanding the delays in repayment.  Malley was however, required to pay additional per diem interest/penalty when the repayments to LaBonte were delayed.

LaBonte learned about Goldberg running a Ponzi scheme shortly after Goldberg turned himself over to the federal authorities in November 2009.  He became aware of this adversary proceeding, brought initially against the Debtors, Malley and a few others, shortly after it was filed in May 2010, from a conversation he had with Malley. Tr. 6/22/11 at 32.

## D.    *The Involvement of SAL North Haven, and SAL Cranston*

LaBonte testified that at some point in time he was made aware through conversations with Malley that Malley was rolling over his investments with the Debtors and had at least twenty million dollars invested with them.  As he had with Gengras, he warned Malley not to keep so much of his money invested with the Debtors and to move the money into other types

---

[47]Interestingly, at the time LaBonte and Gengras spoke, LaBonte still had funds invested so he was not actually "out" of it in the broad sense.  His comment may have been directed to the fact that with the loan fees he had collected from the investments he had solicited from third parties or "feeders," he had already recovered back all the money he had personally invested.

of investment vehicles, such as stocks, bonds or real estate.  Tr. 6/22/11 at 148.  Thereafter, as Malley was repaid his investment by the Debtors, he invested much of it in various LLC's in which LaBonte already had financial interests.  According to LaBonte's testimony, those investment opportunities came as a result of Malley asking him if he would consider "getting him involved" and/or selling him interests in various properties in which LaBonte was invested. Tr. 6/22/11 at 149-150.

In a written stipulation between the Trustee  and Defendants SAL Cranston and SAL North Haven, Adv. ECF No. 439, approved by the Court on July 20, 2011, Adv. ECF No. 443, the parties stipulated to most of the following facts as it concerns these investments.  Other facts are found and determined from evidence adduced at trial, the parties proposed Findings of Fact and the Court's own examination of the record:

1.  On or about February 25, 2009, Defendant, Malley, acquired a 9.0909% interest in SAL Cranston by way of an assignment of such interest from the LaBonte Revocable Trust as reflected in that certain *Assignment and Assumption Agreement,* signed February 25, 2009 (hereinafter, the "SAL Cranston Agreement").  Pursuant to the SAL Cranston Agreement, the consideration furnished by Malley for such assignment was to be the assumption by Malley of the obligation to fund the Scott LaBonte Membership Interests share of the Special Capital Contributions pursuant to Section 7.2 of SAL Cranston Agreement, as well as other consideration stated therein.

2.  Malley caused K & L to make the following transfers from the IOLTA Account on his behalf directly to SAL Cranston on March 6, March 30, June 3 and June 24, 2009 in the amounts of $55,000, $26,000, $40,000 and $100,000, respectively. The Trustee is seeking the recovery of these payments totaling $221,000 as fraudulent transfers.  The funds used

36

to make these payments came into the IOLTA Account as payments of "principal and profit" on Malley's (and everyone else's) investments with the Debtors, Tr. 6/13/11 at 211-212.

3.   On or about February 25, 2009, Malley acquired a 15.385% interest in SAL North Haven by way of an assignment of such interest from Chad P. LaBonte, as reflected in that certain *Assignment, Assumption and Consent Agreement,* dated February 25, 2009 (hereinafter, the "SAL North Haven Agreement").   Pursuant to the language of the SAL North Haven Agreement, the consideration to be furnished by Malley for such assignment was to be the assumption by Malley of the obligation to fund an estimated $250,000 of the estimated total Special Capital Contribution pursuant to Section 7.2 of the SAL North Haven Agreement.

4.   Malley caused K& L to make the following transfers from the IOLTA Account on his behalf, directly to SAL North Haven on June 11, June 24, July 17, August 26, September 24 and November 5, 2009 in the amounts of $15,000, $24,000, $39,000, $33,000, $33,000, and $36,000, respectively.   The Trustee is seeking the recovery of $180,000 as fraudulent transfers and/or $102,000 of said sums as preferential transfers (the August 26, September 24 and November 5 payments), made within 90 days of the petition date.   As testified to by Leary and noted *supra*, the funds used to make these payments came into the IOLTA Account as payments of "principal and profit" on Malley's investments with the Debtors. Tr. 6/13/11 at 211-212.

## E.     The Involvement of Devcon Commons, Devcon Manchester, RCZS, the Malley Revocable Trust and Laundry Express.

The facts as they concern Devcon Commons, Devcon Manchester, RCZS, the Malley Revocable Trust and Laundry Express, are found and determined from evidence adduced at trial, from certain stipulations of the parties, the Proposed Findings of Fact and the Court's

37

own examination of the record:

1.    In February 2009, Malley negotiated the purchase of a 20% membership in RCZS from LaBonte for $150,000, the funds for which came out of the IOLTA Account, at Malley's direction.  The sale was part of a two part transaction whereby LaBonte first purchased Chad LaBonte's 20% membership interest and then sold the 20% interest to Malley.  Portions of the purchase price were then shared with the other owners.  RCZS generated income from the leasing of its aircraft for business or personal use.  As of November 17, 2010, the Trustee and Malley stipulated that RCZS had a negative value of ($400,000), Pl. Ex. 6-M.

2.    The Trustee is seeking from RCZS the recovery of $139,141.90[48] paid out  in various amounts between January 30, 2009 through December 23, 2009 from the IOLTA Account at Malley's direction, as fraudulent transfers[49] and/or $10,000 of said sum as a preferential transfer, made September 1, 2009.

3.    The Trustee is seeking recovery of $4,058.35 paid to Devon Commons from the IOLTA Account at Malley's direction on August 24, 2009 as a either a fraudulent or preferential transfer.  The payments were for rent and related charges owed by Malley pursuant to a lease originally entered into with Freshwater Commons Associates in 2002.

4.    The Trustee is seeking recovery of $13,316.56 in payments made to Devon Manchester from the IOLTA Account over a period extending from May 15, 2009 through

---

[48] The Trustee and RCZS agree as to all of the payments with the exception of a transfer to RCZS on January 30, 2009 in the amount of $30,000.  That payment is, however, reflected on the IOLTA Account. Pl. Ex. 3-P

[49] Of the $139,141.90 in transfers to RCZS, $20,000 was transferred by Malley out of the IOLTA Account on December 23, 2009, more than a month after the petition date.

August 18, 2009 as fraudulent transfers.  The payments were for rent and other related charges owed by Malley doing business as Laundry Express, pursuant to a lease originally entered into with Devon Manchester in 2000.

5*.*    The Trustee, Malley on behalf of himself and the Malley Revocable Trust[50] and T. Malley have stipulated that the Malley Revocable Trust received a transfer of funds indirectly from the Debtors through the IOLTA Account in the amount of $667,500.  The Trustee is seeking recovery of the full $667,500 in payments made over a period extending from July 18, 2008 through December 18, 2009 as fraudulent transfers and/or $59,000 of said sum as preferential transfers for the period extending from September 2, 2009 through November 5, 2009.

6.    Finally, the Trustee is also seeking recovery of a $2,000 payment from the IOLTA Account as directed by Malley to his business Laundry Express on June 24, 2009, as a fraudulent transfer.

7.    As with the other entities, the funds used to make these payments came into the IOLTA Account as payments of "principal and profit" on Malley's investments with the Debtors. Tr. 6/13/11 at 211-212.

## V. PROPOSED CONCLUSIONS OF LAW

A trustee's purpose in bringing adversary proceedings of this nature in Ponzi scheme cases is to recover as preferences and fraudulent transfers the principal and fictitious profits

---

[50]A number of recent Connecticut Superior Court decisions have quoted with support 1 Restatement (Third) of Trusts §25.2 (2003) which states that a revocable, inter vivos trust "is ordinarily treated as though it were owned by the settler." *See Thiele v. Old Saybrook Zoning Bd. of Appeals*, CV-106001901S, 2013 Conn. Super. LEXIS 220, *7 (February 1, 2013); *Swiconek v. Glastonbury Zoning Board of Appeals*, 51 Conn. Supp. 190 (2009).  There is no reason to diverge from that rule here.  The evidence is clear that Malley transferred assets in and out of the Malley Revocable Trust, at will.

transferred to certain redeeming early investors so that the funds recovered can be equitably redistributed to all of a debtor's creditors, including those who invested too late to have received repayment.  Courts have favored *pro rata* distribution of assets where, as here, the funds of the investors were commingled and where the Debtors' conduct resulted in the defrauding of the victims in a similar manner.  *See Cunningham v. Brown*, 265 U.S. at 13; *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331-332 (5th Cir. 2001) (affirming district court's approval of *pro rata* distribution plan where party's assets were held by defrauder in segregated accounts); *CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115-1116 (9th Cir. 2000) (as amended) (affirming district court's approval of *pro rata* distribution plan where assets were commingled).  *Pro rata* distribution is also appropriate here, because the returns paid to those who benefitted from an early redemption came solely from the investment funds solicited from the later investors.  The use of a *pro rata* distribution has been deemed especially appropriate for fraud victims of a Ponzi scheme.  *SEC v. Credit Bancorp., Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002).

## A.   *Preference Recovery Under Bankruptcy Code Section 547.*

Bankruptcy Code Section 547(b) provides in relevant part as follows:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property–
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made–
        (A) on or within 90 days before the date of the filing of the petition; . . . and
    (5) that enables such creditor to receive more than such creditor would receive if–
        (A) the case were a case under chapter 7 of this title;

           (B) the transfer had not been made;  and
           (C) such creditor received payment of such debt to the
extent provided by the provisions of this title.

11 U.S.C. § 547(b) (2009).

      According to the legislative history of section 547(b),

[t]he purpose of the preference section is two-fold. First, by permitting the
trustee to avoid pre-bankruptcy transfers that occur within a short period before
bankruptcy, creditors are discouraged from racing to the courthouse to
dismember the debtor during [its] slide into bankruptcy. The protection thus
afforded the debtor often enables [it] to work [its] way out of a difficult financial
situation through cooperation with all of [its] creditors. Second, and more
important, the preference provisions facilitate the prime bankruptcy policy of
equality of distribution among creditors of the debtor. Any creditor that received
a greater payment than others of [its] class is required to disgorge so that all
may share equally.

*Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 40 (2d Cir. 1996)

(quoting *H. Rep. No. 595, 95th Cong., 1st Sess*. 177-78 (1977)).

      The Plaintiff bears the ultimate burden of proof by a preponderance of the evidence

on all of the elements of a preferential transfer under §547(b).  11 U.S.C. § 547(g) (2009).

A transfer may be avoided as preferential by establishing *all* of the following:

      (1) the transfer is of an interest of the debtor in property;
      (2) to or for the benefit of a creditor;
      (3) on account of an antecedent debt;
      (4) made while the debtor was insolvent;
      (5) within 90 days of bankruptcy or within a year of bankruptcy if the
      creditor was an insider;
      (6) and the transfer enabled the creditor to receive more than it would have
      received in a chapter 7 liquidation had the transfer not taken place.

*Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 180 (2d Cir. 2007), *citing In re Roblin*

*Industries, Inc.*, 78 F.3d at 34.

**B.    *Fraudulent Transfer Under Bankruptcy Code Section 548(a)(1).***

41

The Bankruptcy Code provides for the avoidance of fraudulent transfers made within two years preceding the petition date.  Specifically, Code §548(a)(1)(A) provides, in relevant part, as follows:

> (a)(1)  The trustee may avoid any transfer. . . of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> (A)   made such transfer . . . with *actual intent to hinder, delay, or defraud* any entity to which the debtor was or became, on or after the date that such transfer was made was made or such obligation was incurred, indebted. . . .

Thus, this section permits a trustee to "avoid the entirety of a fraudulent transfer," *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 499 B.R. 416, 423 (S.D.N.Y. 2013).  "Actual fraudulent conveyance claims under Section 548(a)(1)(A) turn on the intent of the debtor in making the transfer; the state of mind of the transferee is irrelevant." *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 304 (S.D.N.Y. 2010).  "A transfer that constitutes an actual or intentional fraudulent conveyance under §548(a)(1)(A) may be avoided in its entirely — as to both invested principal and profits – whether or not the debtor received value in exchange for the transfer." *Id*. at 310, quoting from *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 629-630 (Bankr. S.D.N.Y. 2007).

### 1.    Good Faith and Value Defenses Under §548(c).

"After a debtor makes out a prima facie case of actual or constructive fraudulent conveyance, an initial transferee may nevertheless avoid rescission of a transfer under Section 548(c) of the Bankruptcy Code. . . ." *Bayou* at 439 B.R. at 308; *see, e.g., Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 740 F.3d 81, 90, n.11 (2d Cir. 2014)

42

("recipient of a transfer is entitled to a 'good faith' defense upon a showing that it took the transfer 'for value' and 'in good faith.' *Id.* §548(c).").  Bankruptcy Code §548(c) offers such defendants a defense to a fraudulent conveyance claim with an opportunity to demonstrate what is known as the "good faith defense," and if done successfully, enables them to retain portions of what otherwise would be an entirely avoidable transfer.  *See Gowan v. Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 426 (Bankr. S.D.N.Y. 2011).  Section 548(c) provides:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

"The good faith/value defense provided in Section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense." *Bayou,* 362 B.R. at 631; *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Group, Inc.)*, 232 B.R. 565, 573 (Bankr. N.D.N.Y. 1999), *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 805 (Bankr. S.D.N.Y. 2005) (collecting cases); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002) ("transferee bears the burden of establishing its good faith under section 548(c) of the Code as an affirmative defense that "may be raised and proved by the transferee at trial").

In *Bayou,* 439 B.R. at 310, the court identified the good faith standard as a two-step inquiry.  The first question to be answered is whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with

a fraudulent purpose.  This case was cited as authority for the inquiry notice standard by the Second Circuit Court of Appeals in *Marshall v. Picard,* 740 F.3d at 90, n.11, ("presence of 'good faith' under this section depends upon, *inter alia*, 'whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose.' *In re Bayou Grp., LLC*, 439 B.R. 284, 310 (S.D.N.Y. 2010).").  While technically, this statement was "dicta" on the part of the Second Circuit, the proposition was stated with clarity and certainty.

The *Bayou* court, 439 B.R. 284, and most other courts considering the nature of the fraud necessary to trigger inquiry notice, apply an objective, reasonable man standard, *i.e.*, whether the transferee under the specific circumstances of *this* case reasonably should have known of the fraudulent nature of the transfer(s).  *See* cases cited in *Bayou,* 439 B.R. at 310-311, and such recent cases as *Wagner v. Ultima Homes, Inc. (In re Vaughan Co.)*, 493 B.R. 597, 610 (Bankr. D.N.M. 2013) ("[i]n the Tenth Circuit, 'good faith under [11 U.S.C.] §548(c) should be measured objectively.'  [*In re]* M & L Bus. Mach. Co.*, 84 F.3d 1330, 1338 (10th Cir. 1996). . . . [T]he Court must determine whether the 'circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose. . . .'  In applying the 'reasonable person' standard, the Court must take into account the transferee's individual circumstances, including their sophistication as an investor and whether they had actual knowledge of the fraud").

The second part of the good faith test arises once the transferee has been put on inquiry notice of either the transferor's possible insolvency or the possibly fraudulent purpose of the transfer.  At that point, the transferee must satisfy what has been characterized as a "diligent investigation requirement." *Bayou*, 439 B.R. at 312.  That means the transferee must

44

conduct a diligent investigation of the facts that put it on inquiry notice, or demonstrate that a diligent inquiry would not have uncovered the transferor's insolvency or fraudulent purpose in making the payment. *Id.* at 311, 315-17. *See Whitley v. Connolly*, No. 10-10426C-7G, 2013 Bankr. LEXIS 1803, *10-11 (Bankr. M.D.N.C. May 1, 2013) ("[i]f a reasonable person would have been on notice, the relevant question then becomes whether an inquiry, if made with reasonable diligence, would have led to the discovery of the fraudulent nature of the payments"); *Horton v. Walter O'Cheskey (In re Am. Hous. Found.)*, 544 Fed. Appx. 516, 520, (5th Cir. 2013); (citing the *Bayou* test, 439 B.R. 284)*; Blumenthal v. Cronk (In re M&M Mktg., L.L.C.)*, No. 09-81458, 2014 Bankr. LEXIS 39, *19 (Bankr. D. Neb. January 6, 2014) ("[l]ikewise, good faith is absent if the circumstances 'would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose,'" quoting, *Hayes v. Palm Seedlings Partners - A (In re Agric. Research & Tech. Group, Inc.)*, 916 F.2d 528, 536 (9th Cir. 1990).

This Court must apply an objective standard which, because this case involves experienced and sophisticated business people, should be based on what reasonably prudent investors such as the Defendants knew or should have known from an objective standard, not its subjective view. The standard was explained in the court's jury instructions issued in *Bayou Superfund, LLC v. D. Canale Beverages, Inc. (In re Bayou Group, LLC)*, 2012 U.S. Dist. LEXIS 14976, *18 (S.D.N.Y. February 6, 2012), "[w]hile you may consider what the defendants' witnesses said about their subjective views at the time they submitted their redemption requests, the test you must apply is objective, what a reasonably prudent hedge fund investor would make of the information available to the defendants at the time they submitted their redemption requests."

### 2.  Establishing the "Value" Component of 548(c).

As noted above*,* there are two components to the 548(c) defense.  Thus, even if a good faith defense is established, it is only available "to the extent that such transferee or obligee *also* gave value to the debtor in exchange for such transfer or obligation."  For the purposes of §548(c) "value" is defined as "property or satisfaction or securing of a present or antecedent debt of the debtor."  11 U.S.C. §548(d)(2)(A).  Section 548(c) looks at value from the perspective of the transferee, as in how much value the transferee gave.  *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 203 (Bankr. D. N.J. 2006).

### C.  Fraudulent Transfer Under Bankruptcy Code §544 and Conn. Gen. Stat. §52-552e et. seq.

Bankruptcy Code §544 also permits a trustee to avoid transfers under standards provided by applicable non-bankruptcy law, usually state law.  *See, e.g.*, *Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust),* 634 F.3d 678, 691 n.6 (2d Cir. 2011) (noting that state laws governing fraudulent conveyances . . . "may be invoked in federal bankruptcy proceedings by operation of 11 U.S.C.§544(b)(1)"),[51] *FCC v. Nextwave Personal Communs., Inc. (In re Nextwave Personal Communs.* Inc.), 200 F.3d 43, 49 (2d Cir. 1999), ("[a]pplicable law includes various state fraudulent conveyance statutes").  In this case, the applicable law is that of CUFTA, Conn. Gen. Stat. §52-552e *et. seq.*[52]  This provision enables the trustee to do in a bankruptcy proceeding what a creditor would have been able

---

[51]This section provides in relevant part, "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

[52]This section provides in relevant part: "(a) A transfer made . . . by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made . . . and if the debtor made the transfer . . . (1) With actual intent to hinder, delay or defraud any creditor of the debtor. . . . '

to do outside of bankruptcy, except the trustee will recover the property for the benefit of the estate. Under CUFTA, no fraudulent intent is required with respect to the transferees. *Kosiorek v. Smigelski*, 138 Conn. App. 695, 727 (2012).

Subsection §544(b)(1) contains no substantive provisions indicating what transfers or obligations are avoidable. However, "[i]f there are no creditors against whom the transfer is voidable under the applicable law, the trustee is powerless to act under section 544(b)(1)," 5 Collier on Bankruptcy ¶ 544.06[1] 16th ed. 2013; *see also Official Comm. Of Unsecured Creditors of Cybergenics Corp. (In re Cybergenics Corp.*), 226 F.3d 237, 243 (3d Cir. 2000). ("The avoidance power provided in section 544(b) is distinct from others because a trustee or debtor in possession can use this power only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action").

Thus, although both the Bankruptcy Code and CUFTA use the same substantive language -- actual intent to hinder, delay, or defraud -- and although cases under the Bankruptcy Code are routinely used to construe the parallel provisions of the CUFTA, the standards of conduct for transfer avoidance under CUFTA differ from Bankruptcy Code §548 in certain respects. First, CUFTA permits an avoidance claimant to "reach back" four years, not just the two years provided by§548. *See* Conn. Gen. Stat. §52-552j. Secondly, state law requires a claimant, such as the Trustee here, to meet additional standing requirements, *i.e.,* he must enjoy the status of an actual pre-transfer creditor. Therefore, given the temporal limitations of Conn. Gen. Stat. §52-552e, the Trustee has no "standing" to bring this adversary proceeding unless the record reveals that there was at least one actual creditor whose claim arose *prior* to the transfers. *O'Neil v. Jones (In re Jones)*, 403 B.R. 228, 233 (Bankr. D. Conn. 2009)*; Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996). Here, the Petition Date was

47

within the four-year CUFTA statute of limitations period, and there are actual creditors in this case whose state law rights the Trustee may exercise.[53]    Finally, under CUFTA, the Plaintiff has the additional burden of proving the elements of Conn. Gen .Stat. § 52-552e by clear and convincing evidence.  *See Dietter v. Dietter*, 54 Conn. App. 481 (1999), *cert. denied*, 252 Conn. 906 (1999). In this case however, the Ponzi Scheme Presumption makes it unnecessary to establish this last element. *See infra*.

Therefore, the Plaintiff having established all of the necessary elements of CUFTA that differ from Bankruptcy Code §548(a), the Court may consider the Trustee's intentional fraud claims under Bankruptcy Code §548(a) and CUFTA together.

## D.    Recovery From Transferees Under Bankruptcy Code Section 550(a).

Once it is established that a trustee is entitled to avoid transfers under *inter alia*, Code §§ 544, 547 and/or 548, §550(a) permits the trustee to recover from particular transferees.[54]

---

[53]According to the testimony of Kosowsky, there were at least four or five creditors with allowable claims, some of which existed as far back as 2002, and which continue "through present time." Tr. 6/13/11 at 82-85. He identified them as the United States of America, the State of Connecticut, William Tumber, Amy Spafford and Pearl Davis. *Id*.  None of the Defendants have challenged the Plaintiff's representations in this regard or the existence of at least one such creditor. Therefore, the existence of such creditors is deemed admitted.

[54]Bankruptcy Code §550 provides in relevant part,
(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
    (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
    (2) any immediate or mediate transferee of such initial transferee.
(b) The trustee may not recover under section (a)(2) of this section from—
    (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
    (2) any immediate or mediate good faith transferee of such transferee.
* * *
(d) The trustee is entitled to only a single satisfaction under subsection (a) of this section.

A trustee may assert claims for the recovery of preferences and/or fraudulent transfers against "the initial transferee of such transfer[s]," or the "entity for whose benefit" an avoided transfer is made, 11 U.S.C. §550(a)(1).  However, a prerequisite to recovery against an "immediate or mediate transferee of such initial transferee" under §550(a)(2), (the "subsequent transferee") is the requirement that the Plaintiff establish that the initial transfer is avoidable and that the subsequent transferee was the transferee of the initial transfer.  Further, if the trustee is seeking to recover against the subsequent transferee, the subsequent transferee has an additional defense that may be asserted, not available to the initial transferee.  Under §550(b)(1), the trustee may not recover from the subsequent transferee if that entity took for "value," in "good faith," "and without knowledge of the voidability of the transfer avoided."  Thus, "[w]hether a 'transferee' under §550 is an initial or subsequent transferee . . . has significant consequences with respect to liability and available defenses." *Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs., Inc. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 201 (Bankr. S.D.N.Y. 2005).

As an example, for purposes of "value" under §550(b)(1) a number of cases hold that while the value required to be paid by an initial transferee is "reasonably equivalent value," "'the value required to be paid by the secondary transferee is merely consideration sufficient to support a simple contract. . . . There is no requirement that the value given by the transferee be a reasonable or fair equivalent.' 5 Collier on Bankruptcy, P 550.03, at 22 n. 1 (citations omitted)." *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005).

The first question presented under this section therefore, is whether, based on the facts, either undisputed or as found by the Court, each of the Defendants was an "initial

49

transferee" under section 550(a)(1) of the Bankruptcy Code, the "entity for whose benefit such transfer was made" or, under §550(a)(2), an "immediate or mediate transferee of such initial transferee."  The second question is whether under the circumstances presented in this case, the outcome here will be affected if the transferee is determined to be an initial or subsequent transferee.

**1.**      ***Whether Malley, LaBonte and Other Defendants Are Initial or Subsequent Transferees.***

The Trustee takes the position in Trustee's Post Trial Brief p. 37, that all of the Defendants are "initial transferees" and that while neither the Bankruptcy Code nor CUFTA have defined the term "initial transferee," it is settled law in this circuit that status as an "initial transferee" depends upon the circumstances of the case and is not always determined by identifying the first person to "touch" the money.  To be an "initial transferee" as opposed to a mere "conduit,"[55] the recipient of the transfer must have dominion and control over the money and the right to put those funds to his own use.  The Trustee cites in support of his position, *inter alia, Cristy v. Alexander & Alexander of New York, Inc*., 130 F.3d 52, 57-58 (2d Cir. 1997) which, in turn, relies on *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988) ("we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes").

On this basis, the Trustee and all the Defendants appearing herein agree and the Court concurs, that the IOLTA Account was merely a "conduit" and not the "initial transferee" of the transfers from the Debtors, Trustee's Post-Trial Brief p. 38 ("K&L was a mere conduit of the

---

[55]"The 'mere conduit' theory is based on the premise that the conduit did not have dominion or control over the transferred property and cannot or should not be deemed a "transferee." *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.),* 379 B.R. 5, 23 (Bankr. E.D.N.Y. 2007).

funds transferred by the Debtors to its IOLTA Account. . . .").  An IOLTA Account is by its very nature a conduit for attorneys' funds destined to be paid to or on behalf of an attorney's clients;  *See* Connecticut Rules of Court, Sec. 2-27(a) (limiting use of funds to the role of fiduciary or attorney); *Security First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138 (5th Cir. 1993) (law firm holding funds in trust account held merely in a fiduciary capacity).

### a.  *Malley, the Malley Revocable Trust, and Laundry Express Were Initial Transferees.*

As noted *supra*, in the two year period beginning December 18, 2007, through the end of September 22, 2008**,** Malley received $1,871,720.77 directly from the Debtors as a return on his investments.  Thereafter, payments came to him through the IOLTA Account he set up at K&L.  Leary testified at the Trial that he always verified the receipt of funds with Malley and awaited Malley's direction before any funds were disbursed from the IOLTA Account, including payment of his own fees.  The transfers were all treated by Leary as funds belonging to Malley or funds being held for the benefit of Malley, Tr. 6/13/11 at 181.  Leary, as trustee of the IOLTA Account, had no discretion or authority to do anything with the funds except as directed by his client, Malley.  Nor have the Malleys expressly challenged the Trustee's assertion that Malley and T. Malley were initial transferees (although as discussed *infra* **at p.** 53-55, the Court concludes that with respect to the funds paid over to T. Malley through the IOLTA Account, she was a subsequent transferee).  LaBonte states in LaBonte Defendants' Post-Trial Brief as a proposed finding of fact, "Malley was the initial transferee from the Debtors . . . ." LaBonte Defendants' Post-Trial Brief, p. 3.

The Plaintiff has also adequately established that Malley was the settler and the sole beneficiary of the Malley Revocable Trust and was the sole member of Laundry Express.  *"*The

51

Court of Appeals for the Second Circuit has held that a person's knowledge can be attributed to a corporation in connection with actions which that person through his control causes the corporation to take." *SEC v. Franco,* 253 F. Supp. 2d 720, 729 (S.D.N.Y. 2003)*,* discussing, *S.E.C. v. Manor Nursing Ctrs., Inc*., 458 F.2d 1082 (2d Cir. 1972).  "This principle is "consistent with the self-evident proposition that a corporation [or entity] can act only through the actions of natural persons and that the actions of its agents, acting within the scope of their agency, are attributed to the corporation.*" SEC v. Franco, 253 F. Supp. 2d at 729.  See Bondi v. Bank of America (In re Parmalat Sec. Litig.)*, 383 F. Supp. 2d 587, 597 (S.D.N.Y. 2005) ("acts performed and knowledge acquired by a corporate officer or agent are imputed to the corporation [or entity] where the officer or agent was acting within the scope of his or her employment."); "The rule charging the principal with an agent's knowledge is not necessarily restricted to matters of which the agent has actual knowledge, and . . . the principal is charged with the knowledge of that which the agent, by ordinary care, could have known, especially where the agent has received sufficient information to awaken inquiry. 3 Am. Jur. 2d 650, Agency, § 277 (2002);" *McDermott v. Calvary Baptist Church*, 263 Conn. 378, 385 (2003). ("Because both defendants, the church and the town, were entities, they could act only through their agents.").  Here, payments made by the Debtors to Malley (either directly or through the IOLTA Account) and transferred by Malley to entities entirely dominated by him and within his control, must be treated as if they were paid by the Debtors to Malley and charged with his knowledge.

### b.    *T. Malley Was Both an Initial and Subsequent Transferee*.

As noted above, during the years 2008 and 2009, T. Malley received directly from the

Debtors $128,416.29, as a return on her investments. She is an initial transferee from the Debtors as to those funds. However, as to the additional distributions of $918,566 that T. Malley received in 2009 at Malley's direction through the IOLTA Account, and as to the value of the Maserati motor vehicle she received as a gift from Malley, she was a subsequent transferee. The monies were paid by the Debtors to Malley through the IOLTA Account and then thereafter, were turned over to T. Malley when Malley authorized the funds to be deposited in the Malleys' joint bank accounts. It was exclusively his decision as to when those funds were to be disbursed and to whom.[56] Nevertheless, as T. Malley's testimony made clear, she knew the source of those funds being deposited into their accounts and once deposited, she considered the monies hers to use freely to pay their family's monthly living and business-related expenses. She testified that she was in charge of all the accounting for their various expenses and would write the checks and pay all of their bills. The payments made by the Debtors into the IOLTA Account and thereafter transferred into the Malleys' accounts were treated as if they had been paid to her. It also follows from her testimony that when bills needed to be paid, to the extent funds were available, she would have instructed her husband to withdraw from the IOLTA Account such amounts as were necessary to pay those bills.

While at first she testified to her belief that the monies deposited into their joint accounts were her husband's and not hers, a few minutes later, when asked by her attorney as to why she and her husband withdrew the remaining money from the IOLTA Account even after Goldberg was arrested for running a Ponzi scheme, she appeared to have forgotten her earlier

---

[56]In response to questions concerning the transfers into their bank accounts after the Malleys had become aware that the Debtors were engaged in a Ponzi scheme, Malley repeatedly agreed that the transfers into their accounts were considered by him to be transfers to his wife. Q. "[A]nd yet you directed Jon Leary to make those [four post-petition transfers from the IOLTA Account] to your wife?" Tr. 6/14/11 at 224-228.

testimony that the funds were not hers: Q. "What did you think your choices were? Were you going to leave the money there?"  A. "Well, no."  Q. "Considered the money was owed to you?"  A. "Right. That's what I understood."  Q. "And – and so you didn't really have – when it said you received the money –  "A. "Yes."  Q. " – you thought you were entitled to it, did you not?" A. "I did."  Tr. 6/22/11 at 92.  In sum, once deposited into their accounts, T. Malley had full control over the money, considered it hers and put it to her own use.  *See In re Allen*, Case No. 13-14348, 2014 Bankr. LEXIS, 1302, *31 (Bankr. D.N.J. March 26, 2014) (her use of the funds to support her family was irrelevant if she could not meet all of the elements of the 550(b) defense available to subsequent transferees).

Finally, as it concerns the transfer made from the IOLTA Account at the direction of Malley to Miller Motor Cars in the amount of $144,566.50 (including a $5,000 deposit) for the purchase of a 2009 Maserati motor vehicle for T. Malley, under §550(a)(1), Malley was the initial transferee and T. Malley was the subsequent transferee.  *Cf. Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d at 896, n.3, ("One who conspires with the debtor to make a fraudulent transfer, but has the transfer washed through an innocent party before reaching him, does not thereby escape.  The conspirator will be a subsequent transferee under § 550(a)(2), but subsequent transferees who lack 'good faith' must stand and deliver. Section 550(b)(1).").

### c.    D. Bianca Was a Subsequent Transferee.

As discussed *supra*, no payments were made directly to D. Bianca from the Debtors. The payments made to D. Bianca, came to her in a circuitous way.  These funds were initially transferred from the Debtors and deposited in the IOLTA Account.  Thereafter, at the direction

of Malley, on November 3, 2008 and pursuant to a request he received from P. Bianca, they were withdrawn from the IOLTA Account in one check in the amount of $520,066.66 made payable to Timothy Sheehan, D. Bianca's divorce attorney. Thereafter, they were disbursed to her as agreed upon by the Biancas in connection with their divorce.

### d.    *LaBonte Was a Subsequent Transferee*.

There exists some uncertainty is whether LaBonte was an initial or secondary transferee. There is no dispute among the parties that no payments were ever made by the Debtors directly to any Defendants other than Malley and T. Malley. Nevertheless, while the Trustee asserts in Trustee's Post Trial Brief and Trustee's Reply Brief, that the funds transferred to the IOLTA Account were "earmarked" for LaBonte by Malley and by Goldberg as well, he has produced no evidence to support that position. By contrast, testimony from both Leary and Malley clearly demonstrated that the only party exerting control over the IOLTA Account was Malley and he alone determined to whom payments were to be made. Nor do any of the checks or transfers from the Debtors introduced into evidence by the Trustee and made payable either to the IOLTA Account, Malley or T. Malley, have anything inscribed on them indicating they were specifically intended for the benefit of any other Defendant. Pl. Ex. 12-Z; Pl. Ex. 13-D. No checks from the Debtors were "signed over" to LaBonte or any of the other Defendants.

While the evidence is clear that Goldberg was aware of investments made by LaBonte through at least one meeting that LaBonte attended with Goldberg and the many conversations that took place between Malley and Goldberg that included references to LaBonte, and that Malley transferred monies to the Debtors as directed by LaBonte, no evidence was presented that the transfers made by the Debtors to the IOLTA Account were "earmarked" or subject to

any directions orally or in writing by the Debtors as to their intended application prior to their transfer.

Further, although the evidence established that LaBonte was anxious about the failure of Malley to repay his Notes timely and that he understood his failure to do so was traceable to the Debtors not having paid Malley, there is no evidence that Malley or LaBonte agreed that any specific payments received by Malley directly or through his IOLTA Account from the Debtors were to be set aside for him to assuage his concerns.  Rather, Malley maintained the right to determine to whom payments were to be made and when.  The fact that he did not first have the IOLTA funds literally transferred to his own personal account before he directed their being paid over to others did not mean that he did not exercise dominion and control over those funds.

Malley exercised his control over the funds paid into the IOLTA Account at least in part, to ensure that his and his wife's interests were satisfied in full, ahead of payment to others. Clear evidence of that came from Malley's actions in the weeks after the bankruptcy filing when, knowing that the Debtors had been operating a Ponzi scheme and had filed bankruptcy, he nevertheless withdrew sufficient funds from the IOLTA Account to claim for himself and his wife, all remaining outstanding obligations owed to him by the Debtors.

Nor is LaBonte "the entity for whose benefit such transfer was made."  That language is prumarily intend to apply to entities who do not physically receive the transfer but nevertheless benefit from it such as a guarantor or debtor.  Applying the example given by the court in *Bonded Financial Services v. European American Bank*, 838 F.2d at 892, to the present case, if the Debtors had sent a check to the IOLTA Account or directly to Malley with the express instructions to "use this check to reduce LaBonte's loans to Malley," then Malley

56

would be the "initial transferee," and LaBonte would be the entity for whose benefit the transfer was made. But they did not. Thus, for purposes of determining LaBonte's liability in these transactions, he must be considered a subsequent transferee.

Further, not withstanding LaBonte's arguments to the contrary, the evidence established that LaBonte knew that the funds paid to him out of the IOLTA Account were funds Malley had received from the Debtors, whether intended as repayment of LaBonte's investments with the Debtors or for the purchase of interests LaBonte was selling him in various business entities. Except for the earliest loan, LaBonte's contracts with Malley required the moneys to be invested with the Debtors. LaBonte testified that when payments to him were late, he was informed by Malley that their lateness was a result of the failure of the Debtors to pay Malley on time. Tr. 6/15/11 at 136. Malley testified that LaBonte became upset when he could not pay him on time because he, in turn, had others to whom he owed payments. Tr. 6/14/11 at 197-198. When LaBonte learned that Malley had as much as 20 million dollars invested with the Debtors, LaBonte advised him to diversify his investments and it was subsequent to that conversation that Malley asked if he could invest some of his profits in LaBonte's business entities. The transfers LaBonte received were drawn on the IOLTA Account and LaBonte must have known, both as his cousin and close friend and also from their many conversations about financial matters, Tr. 6/14/11 at 126, that the payments to him from IOLTA Account were coming from the payments Malley had received from the Debtors. LaBonte knew that Malley had no other source of funds that would have allowed him to pay around 3 million dollars to him to make

these investments.[57]  Tr. 6/22/11 at 150.  In fact, LaBonte commented at the Trial that Malley

had a long history of never paid his debts on time.  *See infra* n. 64.

---

[57]LaBonte testified that he was only aware that Malley had rehabbed and was a landlord of several hundred units of three-family and other multi-family buildings, that he owned two laundromats and had invested in at least one Hooters restaurant but had been unable to draw any income from it.  Tr. 6/15/11 at pp. 169-172.

### e.   *SAL Cranston, SAL North Haven, Devcon Manchester, Devcon Commons and RCZS Were Subsequent Transferees.*

SAL Cranston, SAL North Haven, RCZS, Devcon Manchester and Devcon Commons were also subsequent transferees.  As noted above, with respect to entities controlled and dominated by Malley, "acts performed and knowledge acquired by a corporate officer or agent are imputed to the corporation [or entity] where the officer or agent was acting within the scope of his or her employment." *Bond v. Bank of America (In re Parmalat Sec. Litig.)*, 383 F. Supp. 2d at 597.  Evidence submitted by the parties established that the funds necessary to purchase interests in these business entities came from Malley through his IOTA Account.  LaBonte was aware of the source of the funds.  As a consequence of his domination and control of these entities, to the extent LaBonte acquired knowledge as to the fraudulent nature of the funds, said knowledge and the obligation to investigate is imputed to said entities; *cf.* LaBonte Defendants' Post Trial Brief p. 69, attributing LaBonte's claimed *lack* of knowledge to that of his entities ("LaBonte (and therefore Devcon Manchester, LLC and Devcon Commons, LLC) did not know the source of the funds in the K&L IOLTA account.")**.**

### 2.   *The Burden of Proof for a Subsequent Transferee*.

As noted above, in the case of an initial transferee, the good faith/value defense provided in §548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense." *Bayou*, 362 B.R. at 631.  The Bankruptcy Code does not directly address the question as to which party carries the burden of proof under §550(b)(1) as it concerns a secondary transferee or the issues of value and good faith.  However, recent developments in this circuit suggest that regardless of whether the defendant is an initial or secondary transferee, in both instances he bears the burden of establishing his

"good faith" and that he is "without knowledge of the voidability of the transfer avoided."  In

comparing the language of §550(b)(1) and §548(c) one district court held:

> Although section 550's language differs to some degree, the structure of the relevant provisions is largely analogous to section 548. Section 550(a) provides that "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided . . . , the trustee may recover, for the benefit of the estate, the property transferred" from either an initial transferee or "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a).  However, under section 550(b), "[t]he trustee may not recover" from a subsequent transferee who "takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). While the onus of section 550(b)(1) appears to be placed on the Trustee — contrary to section 548(c), which focuses on when a transferee may retain a transfer — this small difference in wording is overshadowed by the structural similarities of the two provisions. Accordingly, in the context of an ordinary bankruptcy proceeding, section 548(c) and section 550(b)(1) both provide an affirmative defense that must be raised by defendants in the first instance.

*Sec. Investor Prot. Corp. v. Madoff Securities, LLC.*, 516 B.R. 18, 23-24 (S.D.N.Y. 2014), (as

corrected May 1, 2014).

While the court there was analyzing the language in the context of a SIPA proceeding,

its conclusion is supported by the legislative history of §550(b)(1): "The phrase 'good faith' in

[section 550(b)(1)] is intended to prevent a transferee from whom the trustee could recover[,]

from transferring the recoverable property to an innocent transferee, and receiving a retransfer

from him, that is, 'washing' the transaction through an innocent third party.  In order for the

transferee to be excepted from liability under this paragraph, he himself must be a good faith

transferee." See S. Rep. No. 95-989, at 90 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5876.

Thus, requiring the same burden of proof whether from the initial or subsequent transferee

furthers the intent of Congress in discouraging improper attempts at avoiding liability.

Therefore, whether arising under Code §548(c) or 550(b)(1) this Court concludes that the

burden of establishing "good faith" and "without knowledge of the voidability of the transfer

avoided" rests in the first instance on the transferee.  A court reached a similar conclusion in

60

a non-SIPA case, *Goldman v. Capital City Mortg. Corp. (In re Nieves)*, 648 F.3d 232, 237, n. 2 (4th Cir. 2011) ("we agree with the weight of authority holding that §550(b) constitutes a defense to an avoidance action which defendant bears the burden to prove.").

In sum, regardless of whether LaBonte and the other Defendants are the initial or secondary transferees, the burden of establishing their good faith remains the same. Further, it has also been held that ("[t]he good faith standard applicable to immediate and mediate transferees should be the same as the good faith standard for initial transferees. . . . [W]e apply an objective good faith standard for the defense available to immediate and mediate transferees in §550(b)(1)."). *Goldman v. Capital City Mortg. Corp.*, 648 F.3d at 239; *see also Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 341 (Bankr. S.D.N.Y. 2011) (defenses of good faith and exchange for value with respect to secondary transfers of commissions may be raised under §550(b)(1) as affirmative defenses). This Court adopts and will apply the same objective good faith standard to the defense of initial transferees and secondary transferees as consistent with the concept of an initial transferee and secondary transferee having the same burden of proof, whether under §§548(c) or 550(b)(1).[58]

Finally, for the reasons stated in the opinion, the Court agrees with the holding of the court in *Sec. Investor Prot. Corp. v. Madoff Inv. Securities LLC (In re Madoff Inv. Sec. LLC)*, 501 B.R. 26 (S.D.N.Y. 2013), that the Trustee does not need a judgment against the initial transferee prior to proceeding against a secondary transferee. Nevertheless, in order to

---

[58]Since §550(b) (1) requires the transferee to show that it took for value, in good faith *and* without knowledge of the voidability of the transfer avoided, the Trustee will prevail if the transferee is unable to establish all of the components. See *Goldman v. Capital City Mortgage*, 648 F.3d at 240-241 (although transferee established that it took for value and without knowledge of the voidability of the transfer, the transfer was recoverable by the trustee because defendant could not establish its good faith).

recover against a secondary transferee, the Plaintiff needs to establish initial transferee liability. *Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760, 768 (Bankr. S.D.N.Y. 2013).

**E.   Whether the Plaintiff Has Established the Element of Actual Fraudulent Intent Asserted in the Second, Sixth, and Twelfth Counts of His Complaint Against Defendants Under Bankruptcy Code §548(a)(1)(A).**

The parties have stipulated that the Debtors operated a pure Ponzi scheme that had no legitimate business purpose.  Although not yet adopted by the Second Circuit Court of Appeals, many courts within this circuit have held that where a pure Ponzi scheme exists, it can be said to give rise to a presumption of actual intent to defraud, as required under the Bankruptcy Code.  *See Gowan v. The Patriot Group, LLC,* 452 B.R. at 425, citing cases making the ordinary "badges of fraud" analysis used in fraudulent transfer cases unnecessary.  One court stated that the logical basis for applying the presumption is the operator of the scheme's knowledge that a Ponzi scheme "'cannot work forever.'" *Bayou,* 439 B.R. at 306.

There is a presumption of actual intent to defraud because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Gowan v. The Patriot Group, LLC,* 452 B.R. at 423; *McHale v. Boulder Capital LLC (In re The 1031 Tax Group)*, 439 B.R. 47, 71 (Bankr. S.D.N.Y. 2010) ("[i]f the Ponzi scheme presumption applies, actual intent for purposes of section 548(a)(1)(A) is established 'as a matter of law.'") (internal quotations omitted); *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011); *Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 221 (Bankr. S.D.N.Y. 2011).

None of the Defendants have attempted to rebut this presumption.  Further, although not necessary here to the Court's finding of a Ponzi scheme presumption is the fact that

Goldberg admitted to operating a pure Ponzi scheme and pled guilty to Wire Fraud in violation of 18 U.S.C. §1343. *See Santa Barbara Capital Mgmt. v. Neilson (In re Slatkin)*, 525 F.3d 805, 814 (9th Cir. 2008) ("a debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent. . . ."); *Bear, Stearns, Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 12 (S.D.N.Y. 2007) (relying on transferor's criminal guilty plea to establish the existence of a Ponzi scheme).

Thus, the initial transferees, Malley (and his related entities) and T. Malley are liable to return all of the transfers received directly from the Debtors under §550(a)(1) unless they can establish that they meet the affirmative defense provided by Bankruptcy Code §548(c) which would allow them to retain a portion of that otherwise entirely avoidable transfer to the extent of the value they provided to the Debtors in the form of their actual investment.  D. Bianca, LaBonte, (and his related entities), and T. Malley, (to the extent of payments that came to her through Malley) as subsequent transferees, are also liable to return all of the transfers received from the Debtors under §550(a)(2) unless they can establish that they meet the affirmative defenses provided by Bankruptcy Code §550(b)(1).

**F.**   ***Whether the Plaintiff Has Established the Element of Actual Fraudulent Intent Asserted in the Fourth, Eighth and Eleventh Counts of His Complaint Against Defendants Under Bankruptcy Code §544(b)(1) and CUFTA***.

None of the Defendants challenge the Trustee's assertions that the Ponzi scheme presumption should likewise be applicable to establish that in making the transfers the Debtors possessed the requisite actual intent to hinder, delay or defraud a creditor of the Debtors under

CUFTA.[59]   *See Santa Barbara Capital Mgmt. v. Neilson*, 525 F.3d at 814 ("a debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent under 11 U.S.C. § 548(a)(1)(A) and California [fraudulent transfer law] and precludes re-litigation of that issue"); *Carney v. Lopez*, 933 F. Supp. 2d 365, 381 (D. Conn. 2013) (court applies Ponzi scheme presumption in case brought under CUFTA, Conn. Gen. Stat. §52-552a *et seq.); Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499, 511 (Bankr. S.D.N.Y. 2011) ("[t]he same Ponzi scheme presumption applies to the New York claim").

G.   *Whether the Defendants Have Met Their Burden of Establishing their Good Faith Under §548(c) or §550(b)(1).*

   1.   *Did the Defendants Have Information That Put Them on Inquiry Notice That the Transfers Were Being Made for a Fraudulent Purpose.*

The Trustee alleges that the various Defendants ignored or failed to detect the numerous "red flags" suggesting that the Debtors were acting fraudulently.  "[T]he issue is whether the alleged 'red flag'[60] information would have put a reasonably prudent . . . investor on inquiry notice . . . that it had a fraudulent purpose. " *Bayou,* 439 B.R. at 313.  Ten "red flags"

---

   [59]"Because it is undisputed that the Defendants were running a Ponzi scheme, the Debtor's actual fraudulent intent is established by the Ponzi scheme presumption."  LaBonte Defendants' Post Trial Brief p. 37, states: "The LaBonte Defendants do not dispute that the transfers by the Debtors are avoidable under the actual fraud provisions of the Bankruptcy Code and CUFTA." *Id.*  The Malleys' Post Trial Brief p. 8, acknowledges the Trustee as having established the requisite fraudulent intent under both bankruptcy law and state law by limiting its discussion of the matter in the Malleys' Post Trial Brief to the following: "Where a debtor pleads and proves its prima facie case involving an allegedly actual fraudulent transfer, a transferee may still defend this claim pursuant to section 548(c) of the Code."

   [60]"Red flag" is a term connoting information that places a transferee on inquiry notice. *Bayou,* 439 B.R. at 314.  n. 26.

recently identified by the SEC Office of Investor Education and Advocacy, issued August 4, 2014 as common signs of potential fraud in the sale of unregistered securities are equally useful in detecting other forms of potentially fraudulent investments.  They consist of (1) promises of high returns with little or no risk; (2) unregistered or unlicensed investment professionals; (3) aggressive sales tactics; (4) problems with sales documents (sloppy documents containing typographical, spelling or other errors); (5) no net worth or income requirements for investors; (6), no one other than the salesman appearing to be involved in the deal; (7) sham or virtual offices; (8) the company not being in good standing in the state where it is incorporated or formed; (9) unsolicited investment offers, often coming from a trusted friend, co-worker or family member and (10), suspicious or unverifiable biographies of managers or promoters.  As noted above, courts have often used these and other "red flags" to identify those situations where a reasonably prudent investor in a Ponzi scheme would have been put on inquiry notice.

As set out in detail above, and highlighted below, are the facts clearly establishing that *all* of the "Red Flags" were in evidence to varying degrees in the manner by which the Debtors' conducted their business operations.

### a.    *Malley and T. Malley*.

It is unnecessary for the Court to recount again, the extraordinarily high returns that were promised to the Malleys along with the assurances that the investments carried little or no risk. As is typical of a Ponzi scheme, the early investors, such as the Malleys received quick and generous returns on their early investments, the better to establish the Debtors' reliability as payers and encourage the investors to invest even more and solicit investments from others. At the same time, the Agreement also included a "buy back" provision which was represented

65

as guaranteeing that the investors were protected from any loss.  They knew that their investments were supposed to be "risk fee."[61]  On top of that, the Agreement provided that taxes on the profits would be paid by the Debtors, which the Malleys claim to have believed, although they testified that they never gave the Debtors their social security numbers and although they were in business with the Debtors for a number of years, were never contacted by the Debtors to discuss payment of their taxes.[62]  To paraphrase a rhetorical question posed by the Court in *In re Jobin v. Lalan (In re M&L Business Mach. Co.)*, 160 B.R. 851, 859 (Bankr. D. Col. 1993): Was it reasonable for the Malleys to expect profits in that amount, especially when it is supposedly a no risk investment? The answer to this question is a "resounding NO!"

The Malleys also knew that Goldberg was not a professional investor – his full time job was selling medical equipment and he dabbled in the music business.  He never represented that he employed investment professionals.  In fact, he did not appear to have any employees or proper office space.  The Malleys were made aware by Leary that there was no record of Acquisitions Unlimited being registered with the Office of Secretary of State.  The documents they saw, including the Agreements they signed, the Letter Addendum concerning the "Chase Manhattan" deals, were ungrammatical, confusing, and generally unprofessionally prepared. Nor were signatures on the various documents necessarily signed by the entity allegedly entering into the respective agreement.

There was no evidence suggesting that Goldberg in any way limited those he accepted as investors. – as long as they had money to invest, that was sufficient.  Referrals for possible

---

[61]*See supra* n. 20.

[62]*See supra* n. 26.

investors often came through longtime friends and family members.  Further, while requests were made, the Defendants never met with any attorneys or accountants representing the Debtors nor were they given copies of income tax returns or other financial reports, although the Debtors were allegedly engaging in millions of dollars of transactions with large and well-known businesses.  As knowledgeable investors, they along with LaBonte, should have expected those companies and their attorneys to have required the Debtors to maintain such financial documents and at least, to be in good standing in the states in which they operated.

In particular, Malley has been engaged in numerous investment opportunities over the years, including commercial enterprises, real estate ventures and stock purchases.  T. Malley testified that she had in the past made a number of private loans to individuals at higher than usual interest rates, although when pressed, admitted she had never been repaid on a private loan at rates approaching the rates paid by the Debtor - the highest rate she had ever received was 10%.  Tr. 6/22/11 at 94.  Although they claim to have made efforts to obtain more detail about the investments and the companies the Debtors were doing business with and were rebuffed, along with requests to speak directly with the parties with whom the Debtors allegedly had a business relationship, they quickly dropped the effort.  It is apparent here that the Malleys' chose to remain willfully ignorant of the facts which would have alerted them to the Debtors fraudulent purpose. *Luzinski v. Gosman (In re Gosman)*, No. 01-30953, 2005 Bankr. LEXIS 3183, at *52 (Bankr. S.D. Fla. March 1, 2005) ("A transferee may not remain willfully ignorant of facts which would alert her to the debtor's fraudulent purpose.")

Evidence of their lack of good faith is perhaps most telling from their conduct after they actually learned of the Debtor's arrest for operating a Ponzi scheme and bankruptcy -- they immediately transferred the remaining funds totaling $261,000. from the IOLTA Account into

their own personal accounts for their own family use or to pay their personal obligations.  In *In Leonard v. Coolidge (In re Nat'l Audit Def. Network),* 367 B.R. 207, 223 (Bankr. D. Nev. 2007), the court suggested that good faith was lacking when there is some knowing participation by the transferee in a transaction that directs assets to transferees at the expense of creditor recoveries.

The Malleys have not met their burden of proof to establish facts to prove the first element of their defense of good faith under §548(c).

### b.    The Malley Revocable Trust and Laundry Express

Malley is the sole member of Laundry Express and the Malley Revocable Trust, as a revocable, inter vivos trust is ordinarily treated as though it were owned by the settler. See discussion *supra* n. 49**.**  They are charged with the same knowledge as that possessed by Malley and only possess good faith to the same extent as Malley**.**  *See supra***.**

### c.    LaBonte

On this same date, this Court for the reasons stated therein, entered an *Order Granting [Plaintiff's] Motion for Adverse Inference on Account of Spoliation*, and has made the following adverse inferences in this proceeding concerning LaBonte: (1), "that LaBonte knew or suspected that he had been participating in an illegitimate enterprise" and (2), "that LaBonte knew or suspected that the transfers he received from the Debtors through the IOLTA Account, were derived from an illegal or illegitimate business enterprise."  Notwithstanding these inferences, however, which alone would be sufficient to permit the Court to conclude that LaBonte had information that put him on inquiry notice that the transfers might be made with a fraudulent purpose, it is unnecessary for the Court to rely on these findings to otherwise

conclude that on the basis of the facts established by the Plaintiff at Trial, LaBonte already had sufficient information about the questionable nature of the Debtors' business operations to put him on inquiry notice.

At Trial, it was revealed that LaBonte was privy to virtually all of the information about the Debtors that was available to the Malleys, having reviewed the Agreement and the Letter Addendum concerning the "Chase Manhattan" deals and having discussed the investment with Malley on numerous occasions. He knew about the very high profits being made by Malley and knew about the "buy back" provisions making the deal virtually "risk-free." Tr. 6/15/11 at 178-184. He saw the provision in the Agreement that required the Debtors to pay the Malleys' taxes and had the same provision included in the notes later given to him by Malley (although there was no evidence that Malley ever paid LaBonte's taxes). It must have been obvious to him that in order to pay Malley such a high return on his investments that the Debtors' own profits must be extraordinary.

While the rate of return promised LaBonte's own investors was high but not extraordinary, when combined with the very high loan fees and interest charges paid by Malley to LaBonte, coupled with the fees charged by Malley on the LaBonte money he invested with Goldberg, and Goldberg's own presumed profits, LaBonte would have had to understand that this was an extraordinary arrangement. Further, in addition to LaBonte's substantial profits, such gains were to a degree guaranteed since when LaBonte charged a loan fee he received his cut before the funds were placed with the Debtors, and in other instances, he had Malley as a backstop in the event of the Debtors' default. While there was testimony (but no further substantiation) that LaBonte had experienced real estate investments that brought him gains that were comparable or even better that what he was being paid through the Goldberg

69

investments, suggesting therefore, that the high gains here were not particularly suspicious, there was no testimony suggesting that in those other instances as here, his gains came only after similar or better gains had already been paid to others out of the same investment and with so little effort on his part.

Notwithstanding his testimony to the contrary, as an experienced, hard-nosed businessman and investor, the evidence suggests that LaBonte would have had to be concerned about the extraordinary profits that were derived from the investment as described to him by Malley. Combined with just a glance at any of the amateurish documents, it would have had to put him on alert. Nevertheless, he admitted at the Trial (confirming his earlier testimony in a deposition, Pl. Ex. TT) that there was an investment opportunity he wanted to take advantage of and the only way to do that without going around his cousin Malley, was to work through him. Tr. 6/15/11 at 196-197. In the Court's view, the reason why LaBonte continued to invest through Malley even after becoming aware of the business model outlined by Malley and developing a relationship with Goldberg, was not because he didn't want to "go around" Malley but because he though that investing through Malley would insulate him from any liability and loss if the questionable investment with Goldberg went sour. Rather than supporting the Defendant's argument that he was making a loan to Malley and not investing with the Debtors directly, his conduct can be seen as demonstrating LaBonte's concerns over the validity of the investment. By investing in the scheme through Malley he saw himself as protected from the risk of its being revealed as fraudulent and he a participant.

Further, the LaBonte notes required Malley to invest his money with the Debtors for an even more important reason – the loan fees he was extracting from his own investors combined with the return of principal and interest he was promised would not have been possible if the

70

moneys were simply unsecured loans to Malley for use by him in his normal business activities – they had to be put to use by Malley in a way that would return to LaBonte enormous profits. That was what investing with the Debtors promised.  Tr. 6/15/2011 at 196-197.

LaBonte understood that repayment of the notes was dependent on repayment of Malley's investment with the Debtors.  When LaBonte began to have trouble getting paid by Malley he determined to stop making the investments because he understood from Malley that Malley was having trouble getting paid by the Debtors.  It was Goldberg, LaBonte and Malley spoke to when LaBonte was concerned over Malley's failure to meet his repayment obligations.

Further, LaBonte explained to his own investors the use to which the money was to be put.[63]  In deposition testimony, LaBonte, answered "correct" when asked this question by the Trustee's counsel: "So these gentlemen, all of them that are on [a list of LaBonte's investors] invested in Acquisitions Unlimited through you based on your representation that Ed Malley had laid out the facts as you've just shared them with me?"  Pl. Ex TT.  Thus, LaBonte, as with Malley, was not just an investor but became a participant in the fraud itself.  By adding to the pot in placing other peoples' money with the Debtors, he and Malley were both extending the ability of the Debtors to keep the Ponzi scheme going and at the same time increasing the likelihood that their own investments would be repaid.

Both LaBonte and Malley presented testimony to the effect that to their personal knowledge no other similarly situated investors took any affirmative action that would suggest that they suspected insolvency or fraud.  In determining what weight a reasonably prudent

---

[63]In the promissory notes he signed with his own investors, LaBonte also included a provision on the front page in bold that stated "The funds received pursuant to this note shall only be utilized for an investment in Acquisition Unlimited, LLC."  (The final "s" was dropped in the Notes LaBonte gave to his investors). He also explained the nature of the business conducted by Acquisitions Unlimited and that he was making a profit himself. Deposition of LaBonte Pl Ex. TT.

institutional hedge fund investor would have given the alleged "red flag" information, the fact finder may consider the behavior of such investors who did, in fact, receive the information, *cf. In re Manhattan Inv. Fund Ltd.,* 397 B.R. at 23 ("the best evidence of what a prudent prime broker would have done is what Bear Stearns actually did."). However, the Defendants did not present any testimony or other evidence from third party investors who were not also Defendants in the adversary proceeding. Nor was any evidence introduced as to the other investors level of sophistication or the amount of information they were privy to. By contrast, the most effective testimony came from Robert Gengras also a sophisticated investor, who, when presented with an opportunity to invest with the Debtors, immediately thought that the investment was too good to be true. He remarked to the effect that if the investment was as good as represented, why would Goldberg want or need his money?

Further, the absence of complaints to authorities does not by itself suggest a lack of suspicion on the part of other investors. Most of the investors were reaping incredibly generous returns on their investments. Complaining about the investments could have been seen as "killing the goose who laid the golden egg" by jeopardizing their future receipt of such profits. Noteworthy is the fact that even after Malley knew that Goldberg had surrendered to the FBI, his and his wife's response was not to go to the authorities to aid them in their investigation but to withdraw from the IOLTA Account the balance of what they believed remained due to them by Goldberg. Nor did LaBonte take any action to aid the investigation.

LaBonte has not met his burden of proof to establish facts to prove the first element of his defense of good faith under §550(b)(1).

### d.    SAL Cranston, SAL North Haven, Devcon Manchester, Devcon Commons and RCZS.

It is undisputed that in exchange for the payments made by Malley from the IOLTA Account, he was given certain ownership interests in SAL Cranston, SAL North Haven, Devcon Manchester, Devcon Commons and RCZS, and therefore each entity gave value. Nevertheless, as entities in which LaBonte was the managing member, they cannot succeed in their claim that they received payments in good faith if LaBonte cannot also succeed, because they are charged with the same knowledge as that possessed by LaBonte. See *supra*.

### e.    D. Bianca

Plaintiff's evidence and application of the Ponzi scheme presumption establish that D. Bianca was the recipient of a fraudulent transfer.  There was only scant evidence at Trial suggesting that D. Bianca had information that would have put her on inquiry notice that the Debtors were insolvent or that the transfers from the Debtors to Malley might be made with a fraudulent purpose and that evidence was the fact that security given for the loan included assets belonging Michael Goldberg/Acquisitions Unlimited, even though there was no indication on the Note that the funds were to be invested with Goldberg.  There was evidence that she gave value for the transfers she received.  Nevertheless, as discussed *supra*, it is the subsequent transferee who bears the burden under §550(b) of establishing all of the elements of the good faith defense, none of which she has done as a result of her failure to appear at the trial and defend, notwithstanding her having an attorney who filed an *Appearance* Adv. ECF No. 153 and an *Answer to Amended Complaint* . . ., Adv. ECf No. 188, on her behalf.  The Court cannot take inferences and possibilities and turn them into findings of fact.

**2.    *Whether Having Information That Put Defendants on Inquiry Notice the Defendants Conducted a Diligent Investigation*.**

The Court, having concluded that the Defendants were on inquiry notice of the possibly fraudulent purpose of the transfer, the Court must next determine whether they met the "diligent investigation requirement." *Bayou*, 439 B.R. at 312.  Once a transferee is placed on inquiry notice, he must conduct a diligent investigation of the facts that put him on inquiry notice, or demonstrate that a diligent inquiry would not have uncovered the transferor's insolvency or fraudulent purpose in making the payment. *Id.* at 312-213; 315-17.

On the basis of the evidence presented at Trial, the Court concludes that neither Malley, T. Malley nor LaBonte (nor by extension, the business entities controlled by them), conducted a diligent investigation of the facts that put them on inquiry notice, nor were they able to demonstrate that a diligent inquiry would not have uncovered the transferor's fraudulent purpose in making the payments.  *Id.* at 311, 315-17.

Although both Malley and T. Malley had been given ample reasons to be suspicious of the Debtors' operations from the outset, and were given increasing reasons to be suspicious as time went on, they appeared to deliberately avoid making the sort of investigation called for under the circumstances.  They stood to make staggering sums in relation to their original investments and looking too carefully into the Debtors and their operations could have jeopardized the future of those returns.  Malley met with Goldberg on many occasions and spoke to him regularly.  Nevertheless, at no time prior to making their first investments nor at any time thereafter, did the Malleys speak to Goldberg's accountant or attorney about the Debtors' business operations or obtain any supporting documents from them.  Although Malley requested from Goldberg an opportunity to examine his tax returns and/or financial

statements, they were never provided.  Mark Legoski, who was Goldberg's accountant during this period of time, testified that he was never contacted by Malley or LaBonte concerning the Goldberg investments.  Since the returns on the Debtors' investments were not included on any tax returns filed by the Debtors during the entire time they were investors, both the Malleys and LaBonte would have readily learned that there were the tax returns were false and incomplete.  The absence of any tax reporting of its business activities coupled with the absence of any financial reports, particularly in light of the prominence of their alleged clients would have immediately indicated to the Defendants the fraudulent nature of the entire investment operation.  Goldberg's personal accountant testified that he did not even know about his investment businesses until 2009!

Neither Malley nor T. Malley ever asked their attorney, Leary, to evaluate the advisability of the initial investments, nor to verify Goldberg's background or education.  The one piece of information that they did receive from Leary, that Acquistions Unlimited was not registered with the Secretary of State, was not followed up.  If anyone had pursued contact with any of the Debtors' third party customers or had simply made additional efforts to reach "Frank Foellner," after they were unable to reach him the first time he was called, they would have found out about the fraud.

T. Malley's excuse for not doing any investigation about the investment was that she simply relied on her husband, although having met with Goldberg, having signed or reviewed at least seventeen of his amateurish and confusing Agreements, and having made a number of private loans on prior occasions herself, she would have had to recognize the questionable nature of this investment.  "Given that good faith is determined using an objective standard and that no reasonable person would have proceeded in a manner similar to the defendants

without completing the requisite due diligence, "[the investor's] excuse that 'he didn't know better' merely establishes ignorance, not good faith." *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 661 (Bankr. M.D. Fla. 2002).

Notwithstanding the large amounts LaBonte invested in the Goldberg scheme, and its significant legal and tax law implications, particularly the provision in the Note that stated that Malley would pay LaBonte's tax obligations arising from the repayment of the investment, LaBonte did not discuss the investment with his own accountant or attorney, both of whom he had employed for many years.[64]  Nor, even after he solicited friends and relatives to invest through him and began to receive a return on his own investments did he discuss the transactions with his accountant and attorney.  His failure to consult with his most trusted advisors in a matter that concerned millions of dollars, suggests that he knew from the outset of his discussions with Malley and later with Goldberg, that the Debtors might not be legitimate and the nature of the investment was possibly fraudulent but did not want to raise the matter with his advisors because he knew they would say –that he should stay away from it.  The promise of easy money was just too tempting for him to resist and he did not want to be talked out of the investment.

LaBonte met personally with Goldberg on at least one occasion over several hours, discussed with him the details of the investment, reviewed the poorly drafted Agreements the Debtors had with Malley and knew of his lack of professional experience, yet did not ask from him at that time or at any time thereafter for any tax returns other financial information or for

---

[64]He testified that Levy & Droney, his attorneys, had represented him for over twenty years.  Tr. 6/15/11 at 186.  He so trusted his long-time accountant, Sparveri, that he named him as one of the co-trustees when he established the LaBonte Dynasty Trust to which he transferred virtually all his assets shortly after this adversary proceeding was filed.

an opportunity to meet with his attorney or accountant.  As with Malley, If he had insisted upon receiving copies of the Debtors' financial reports and copies of tax returns as any reasonable investor would have done with an investment of this nature with no safeguards, he would have readily learned that there were no financial reports and that the tax returns Goldberg had been filing were fraudulent and incomplete.  As noted above, Goldberg's 2006 and 2007 returns included nothing in connection with Acquisitions Unlimited or Michael Goldberg, LLC.

At trial, LaBonte defended his failure to do any investigating into the authenticity of the investment on several grounds, one of which was that he was investing with Malley,  not with the Debtors.  However, the facts belie that assertion.  Inclusive of the money that was paid over to him that was subsequently transferred to his own investors, LaBonte received 7.2 million dollars from the Debtors through the IOLTA Account.  Except for the first $100,000 Note, all of the loans required that they be invested with the Debtors through "Acquisition" Unlimited, LLC.

Further, his conduct during the period he was making these investments did not support his argument that the loans were strictly to Malley.  Prior to this period, LaBonte had never made any loans to Malley, never invested money with him and the only business transaction in which they had both been involved was LaBonte's LLC, Devcon Manchester, leasing space to Malley 's business, Laundry Express.  Nevertheless, he did not at any time request financial statements nor tax returns from Malley.  In fact, in his testimony he suggested that Malley had a history of not paying his obligations promptly.[65]  He did not ask Malley for any security to

---

[65]"Ed has unfortunately, a habit of not paying on a timely basis, even when -- well before this situation, he was usually one of the last rent payers in each one of the shopping centers on a monthly basis. So it was relatively normal for us to have to follow-up and chase him."  Tr. 6/22/11 at 243.

protect his investment, Tr. 6/15/11 at 87.   In an e-mail sent by Leary to Goldberg, in which Leary reminds Goldberg of the impact his late payment to Malley has on Malley's own investors, including LaBonte, he states, "Ed knows you already offered the $10,000 for late fees for Scott/etc." Pl. Ex. 5-F.   Malley, LaBonte and Goldberg as well as Leary, were well aware that the investments were not with Malley but with Goldberg and the consequences of his failure to pay LaBonte timely.

On the other hand, from his review of several of the Agreements and Letter Addendum LaBonte understood that the very generous returns being paid to Malley meant that Goldberg had to have been making a profit substantially in excess of 100%. Tr. 6/15/11 at 181.  The money was there.  Malley's own financial ability to repay the investment was irrelevant.

In sum, none of the Defendants have met their burden of establishing facts to prove either the first or second elements required of a good faith defense either as initial transferees under §548(c) or as subsequent transferees under §550(b)(1).

### 3.      Whether the Defendants Gave Value Within the Meaning of §548(c) and §550(b)(1).

As discussed above, even if a good faith defense had been shown, it would only have been available to the extent that a transferee or obligee *also* gave value to the debtor in exchange for such transfer or obligation.  Therefore, because the Court finds that Mallley and T. Malley have not met the burden of establishing a §548(c) good faith defense, nor has LaBonte, T. Malley nor D. Bianca met their burden under the "good faith" standard of §550(b)(1), it is not necessary for the Court to consider the extent to which these parties gave value and met the requirements of their respective Code and CUFTA provisions. Consideration of the "value" defense is necessary only if there is both good faith and value.

Here, good faith was lacking, so value is irrelevant. *See, e.g., Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Tech. Group, Inc.)*, 916 F.2d 528, 538 (9th Cir. 1990) ("[e]ven if the transferee gave reasonably equivalent value in exchange for the transfer avoided on either of the alternate theories, the transferee may not recover such value if the exchange was not in good faith because good faith is "indispensable" for the transferee who would recover any value given pursuant to 11 U.S.C. § 548(c)); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995), (under Illinois version of Uniform Fraudulent Transfer Act, "if fraudulent intent is proved, then . . . the defendant, unless he had no knowledge of the transferor's fraudulent intent must return the entire payment that he received rather than just the amount by which it exceeded the consideration that he gave in exchange for the payment"); *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994) ("[W]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given.") (applying the actual fraudulent conveyance provision of New York's version of the Uniform Fraudulent Conveyance Act); *Leonard v. Coolidge (In re National Audit Def. Network)*, 367 B.R. 207, 225 (Bankr. D. Nev. 2007) ("good faith was lacking, so value is irrelevant.").

Finally, because the Court finds that neither LaBonte, T. Malley nor D. Bianca have met the required element in §550(b)(1) that the transferees took in good faith, it is not required to consider the third element of the subsection, whether they took "without knowledge of the voidability of the transfer avoided."

### H.  *Whether the Plaintiff is Entitled to Recovery of Allegedly Preferential Payments Made to Defendants*.

The Trustee also claims that the direct payments made to Malley by the Debtors and

indirect payments made by the Debtors to Malley through his IOLTA Account and by him (or authorized by him) to LaBonte and other Defendants, constitute preferential transfers, and are therefore avoidable by the Trustee.  The Trustee has alleged that he has established each of the six elements[66] of a preference as it concerns transfers made within 90 days of the petition date, in particular, four transfers to Malley on September 2, October 5 and 28, and November 12, 2009 in the amounts of $20,000, $20,000, $17,000, and $15,000, respectively; five transfers to T. Malley on September 2, October 5, (three separate transfers occurring on that day) and November 12, 2009 in the amounts of $10,000, $15,000, $10,000, $50,000 and $10,000 respectively; three transfers to the Malley Revocable Trust on September 2, October 28, and November 5, 2009 in the amounts of $40,000, $5,000 and $7,000, respectively; one transfer to Devcon Commons, LLC, on August 24, 2009 in the amount of $4,058.35; three transfers to SAL North Haven on August 26, September 24 and November 5, 2009 in the amounts of $33,000, $33,000 and $36,000 respectively; and one transfer to RCZS on September 1, 2009 in the amount $10,000.

Under Bankruptcy Code §547(f), the Debtors are presumed to be insolvent within the 90 days immediately preceding the filing of the bankruptcy petitions.  Further, the evidence, particularly as contained on Pl. Ex. A, pp. 5-7 and Sched. 4a and 4b clearly establish Debtors' insolvency over the period of August 20, 2009 through the November 18, 2009 petition-date, (element 4), and that the payments were made within 90 days of the bankruptcy filing (element 5).  Evidence admitted also establishes as to the Malleys and the Malley Revocable Trust, an

---

[66]See identification of the six elements *supra*.

entity that received payments at Malley's direction,[67] that the transfers were of an interest of the Debtors in property (element 1), were for the benefit of a creditor (element 2), and on account of an antecedent debt (element 3).  *See* Trustee's Post Trial Brief p. 48-49.

As to element 6, it is the Trustee's burden to establish that the transfer enabled the creditor to receive more than it would have received in a Chapter 7 liquidation had the transfer not taken place by showing the actual effect of the payment, determined as of when the bankruptcy occurs**.** *Mendelsohn v. National Westminster Bank, U.S.A. (In re Frank Santora Equip. Corp.)*, 256 B.R. 354, 375 (Bankr. E.D.N.Y. 2000).  Nevertheless, the existence of a Ponzi scheme, stipulated to in this case, which by its very nature signifies that at no time could the Debtors ever have had sufficient assets to repay their creditors in full, is sufficient to establish this element.  Further, the evidence is clear that the Chapter 7 estate will never be able to pay Malley as much as he received from the transfers.  Neither did the Malleys nor the Malley Revocable Trust offer any contradictory evidence at Trial.  Thus, the Trustee may recover as preferences the funds transferred to Malley, T. Malley, and the Malley Revocable Trust as alleged in their Amended Complaint

As to Devcon Commons, SAL North Haven, and RCZS, the issue is slightly different. Devcon Commons, SAL North Haven, and RCZS were not initial transferees of the Debtors. Malley, in this instance, was the person for whose benefit the transfers were made.  While §550(a)(2) allows for recovery from subsequent transferees, Devcon Commons, SAL North Haven and RCZS have the right to establish under Code §550(b)(1) that the funds were received in good faith, for value and without knowledge of their voidability and therefore,

---

[67] As discussed *supra* n. 49, a revocable trust is ordinarily treated as though it were owned by the settler.

cannot be recovered.  *Kirschenbaum v. Leeds Morelli & Brown P.C.(In re The Robert Plan of N.Y. Corp.)*, 456 B.R. 150, 160 (Bankr. E.D.N.Y. 2011).   However, LaBonte was also a member, officer, and/or full or part-owner of the entities and Malley, a member of RCZS.  As discussed above, an entity can act only through the actions of natural persons and that the actions of its agents, acting within the scope of their agency, are attributed to the corporation or entity.

Here, LaBonte's and Malley's knowledge and lack of good faith must be attributed to the closely-held entities in which they had an interest.  Thus, the defense under §550(b)(1) offered to subsequent transferees is not available to Devcon Commons, SAL North Haven and RCZS to the extent the defense is denied Malley and/or LaBonte.  Since LaBonte is not able to meet the burden of establishing all the elements required of a defense under §550(a)(1), and Malley can not establish a good faith defense under §548(c), the Trustee may avoid the transfers to the subsequent transferees as preferential.  Of course, as indicated in §550(d), the Trustee is limited to only a single satisfaction with respect to the avoidable transfers.

## I.   *Whether the Plaintiff Has Adequately Traced the Funds From the Debtor to the Initial Transferees and From the Initial Transferees to the Secondary Transferees*.

To satisfy his burden to recover a fraudulent or preferential transfer from an initial or subsequent transferee, the Plaintiff must show that the funds at issue originated with the Debtors, as well as identify who received the funds, how much was transferred, when the transfers occurred, and establish an entity as a initial or subsequent transferee of the funds.  Nevertheless, "it is also true that proper tracing does not require dollar-for-dollar accounting."  *IBT Int'l. Inc., v. Northern (In re Int'l. Admin. Servs.*), 408 F.3d 689, 708 (11th Cir. 2005).  The Plaintiff is only required to establish his entitlement to prevail here by a preponderance of the

evidence. *Id*. Nevertheless, the extent of the burden on the Plaintiff is significant in a case such as this one where the the Debtors had incomplete or missing records, typical of a Ponzi schemer and certain Defendants, particularly LaBonte, did not maintain many records related to the transactions. In his testimony at the Trial, LaBonte admitted that in the course of document production, he did not produce for the Plaintiff a single letter communication or e-mail related to his dealings with Malley and the Debtors. Tr. 6/22/11 at 57. *See Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 334 (6th Cir. BAP 2007) (plaintiffs met their burden of tracing the funds even though defendants were successful in leaving no paper trail as they proceeded with their scheme).

At the Trial, the Plaintiff presented an adequate tracing analysis[68] of the funds paid and received, some payments made directly by check from the Debtors to the Malleys, Pl. Ex. 12-Z, and other payments evidenced through Pl. Ex. 13-D, Bank of American Teller Logs; payments to LaBonte through Pl. Ex. R; the testimony of Kosowsky, factual evidence contained in the Kosowsky Report[69] and/or through the testimony of Leary who, in particular, discussed the use of the IOLTA Account for the transmittal of funds. Tr. 6/13/11 at 178-179. Malley verified the accuracy of the transfers from the IOLTA Account as reflected on the Additional Defendant Transfer Ledger attached to the Amended Complaint, Tr. 6/14/11 at 109-110; Pl. Ex. 4-M. Malley also testified that Leary did all the accounting for Malley's investments with the Debtors and kept track of all payments made and amounts outstanding.

---

[68]The tracing analysis included dates and amounts and identified each of the payors and payees.

[69]The Court noted at the Trial that while the Court was admitting into evidence the Kosowsky Report, it would only consider the facts presented therein and would not consider and would ignore any labels that appeared to express a legal conclusion as to certain transfers being avoidable and recoverable as preferences or fraudulent transfers. Tr. 6/13/11 p. 61-62.

Tr. 6/14/11 at 130-131.  Additionally, as discussed *supra,* in a number of instances, the Plaintiff and one or more Defendants stipulated to certain of the transfers as having been made.

As it concerns Malley, the Plaintiff and the Defendant Malley have stipulated at Trial that he received in direct transfers from the Debtors the sum of $1,871,720.77[70] which were made between December 18, 2007 and September 22, 2008.  Malley also received transfers from the Debtors through the IOLTA Account in the amount of $12,366,000 of which $1,257,531.04 was paid to Malley through the IOLTA Account within 90 days of the petition date.  The Plaintiff has established that these transfers constitute preferential and/or fraudulent transfers under §§544(b)(1), 547(b) and/or 548(a)(1) and are recoverable under 550(a)(1) as alleged in the Second, Fourth, Sixth and Eighth Counts of the Amended Complaint. The details of the transfers are further established through the Kosowsky Report, Pl. Ex. A, Schedule 7a and 7b, and the Malleys' Post Trial Brief, and proposed findings of fact ¶6 ("[t]he Debtor transferred $12,366,000.00 to the K&L IOLTA account."

As it concerns T. Malley, the Plaintiff and the Defendant have stipulated that she received transfers from the Debtors in the amount of $918,566[71] through the IOLTA Account, of which $95,000 was paid within 90 days of the petition date and an additional $144,566.50[72] in the form of a 2009 Maserati motor vehicle that was a transfer from the Debtors to the IOLTA Account which Malley authorized be transferred to Miller Motor Cars for the purchase of the

---

[70]Oral stipulation reported to the Court, Tr. 6/13/11 at 19, 21-22.

[71]Oral stipulation reported to the Court, Tr. 6/13/11 at 19-20. This sum includes the amounts that were transferred by the Debtors to the IOLTA Account but were not withdrawn by the Malleys until after the Debtors' bankruptcy filing.

[72]Oral stipulation reported to the Court, Tr. 6/13/11 at 19-21, 35-36

vehicle for T. Malley.  The Plaintiff has established as alleged in the Eleventh, Twelfth, and Fourteenth Counts of the Amended Complaint that said sums are recoverable as fraudulent transfers under §544(b)(1) and §548(a)(1) and are recoverable under §550(a)(1), of which $95,000 is alternatively recoverable as preferential under §547(b).  The details of the transfers are further established through the Kosowsky Report, Pl. Ex. A, Schedule 7a and 7b

As it concerns the Malley Revocable Trust, the Trustee and Defendant, Malley Revocable Trust orally stipulated at Trial that the Trust received $667,500[73] and the Trustee has established, as alleged in the Eleventh, Twelfth, and Fourteenth Counts of the Amended Complaint that said sums are recoverable as fraudulent transfers under §544(b)(1) and §548(a)(1) and are recoverable under §550(a)(1), of which $59,000 is alternatively recoverable as preferential under §547(b).  The details of the transfers are established through the Kosowsky Report, Pl. Ex. A, Schedule 7a and 7b and the Additional Defendant Transfer Ledger attached to the Amended Complaint.

As it concerns Laundry Express, the Trustee has established the damages he alleged in the Twelfth, and Fourteenth Counts of the Complaint; that the Debtors through the IOLTA Account as directed by Malley, transferred to Laundry Express $2,000 and that said transfer constitutes a fraudulent transfer voidable under §544(b)(1) and 548(a)(1) and recoverable under §550(a)(1).  The details of the transfer are established through the Kosowsky Report, Pl. Ex. A, Schedule 7a and the Additional Defendant Transfer Ledger attached to the Amended Complaint.

As it concerns RCZS, the Trustee has established the damages he alleged in the

---

[73]Oral stipulation reported to the Court, Tr. 6/13/11 at 19-21.

Eleventh, Twelfth, and Fourteenth Counts of the Complaint; that the Debtors through the IOLTA Account as directed by Malley, transferred to RCZS, $139,141.90 and that said transfers constitute fraudulent transfers voidable under §544(b)(1) and 548(a)(1) and recoverable under §550(a)(1) and (2), of which $10,000 is alternatively recoverable as preferential under §547(b) The details of the transfers are established through the stipulation of the Trustee and RCZS, *see, supra* and n. 46-48, the Kosowsky Report, Pl. Ex. A, Schedule 7a and 7b and the Additional Defendant Transfer Ledger attached to the Amended Complaint.

As it concerns LaBonte, the Trustee has established the damages he alleged in the Twelfth and Fourteenth Counts of the Amended Complaint.  The Trustee has established that the Debtors through the IOLTA Account as directed by Malley, transferred to LaBonte $7,241,797.52 and that said sums constitute fraudulent transfers voidable under §544(b)(1) and 548(a)(1) and recoverable under §550(a)(1) and (2).  The details of the transfers are established through the Kosowsky Report, Pl. Ex. A, Schedule 7a, Pl. Ex. R and 12-Y, Tr. 6/13/11 at 182-187, and the Malleys' Post-Trial Brief, proposed findings of fact ¶6 ("$7,241,797.52 . . . was transferred to Scott LaBonte.").

As it concerns SAL Cranston, the Trustee has established the damages he alleged in the Twelfth and Fourteenth Counts of the Amended Complaint; that the Debtors through the IOLTA Account as directed by Malley, transferred to SAL Cranston $221,000[74], and that said sums constitute fraudulent transfers voidable under §544(b)(1) and 548(a)(1) and recoverable under §550(a)(1) and (2).  The details of the transfers are also established through the Kosowsky Report, Pl. Ex. A, Schedule 7a, Pl. Ex. S and Tr. 6/13/11 at 195.

---

[74]Dates of payments and amounts were stipulated to in a written agreement between the Trustee and Defendants SAL Cranston and SAL North Haven, Adv. ECF Nos. 439, approved by the Court, Adv. ECF No. 443.

As it concerns SAL North Haven, the Trustee has established the damages he alleged in the Eleventh, Twelfth and Fourteenth Counts of the Amended Complaint. The Trustee has established that the Debtors through the IOLTA Account as directed by Malley, transferred to SAL North Haven $180,000,[75] and that said sums constitute fraudulent transfers voidable under §544(b)(1) and 548(a)(1) and recoverable under §550(a)(1) and (2) of which $102,000 is alternatively recoverable as preferential under §547(b). The details of the transfers are also established through the Kosowsky Report, Pl. Ex. A, Schedule 7a and 7b, Pl. Ex. T and Tr. 6/13/11 at 195.

As it concerns Devcon Commons, the Trustee has established the damages he alleged in the Eleventh Twelfth and Fourteenth Counts of the Amended Complaint. The Trustee has established that the Debtors through the IOLTA Account as directed by Malley, transferred to Devcon Commons $4,058.35, and that said sums constitute fraudulent transfers voidable under §544(b)(1) and 548(a)(1) and recoverable under §550(a)(1) and (2) of which $4,058.35 is alternatively recoverable as preferential under §547(b). The details of the transfers are also established through the Kosowsky Report, Pl. Ex. A, Schedule 7a and 7b, and the Additional Defendant Transfer Ledger attached to the Amended Complaint.

As it concerns Devcon Manchester, the Trustee has established the damages he alleged in the Twelfth and Fourteenth Counts of the Amended Complaint. The Trustee has established that the Debtors through the IOLTA Account as directed by Malley, transferred to Devcon Commons $13,316.56, and that said sums constitute fraudulent transfers voidable under §544(b)(1) and 548(a)(1) and recoverable under §550(a)(1) and (2). The details of the

---

[75]Dates of payments and amount stipulated to in a written agreement between the Trustee and Defendants SAL Cranston and SAL North Haven, Adv. ECF Nos. 439, and approved by the Court, Adv. ECF No. 443.

transfers are also established through the Kosowsky Report, Pl. Ex. A, Schedule 7a, Pl. Ex. V, and the Additional Defendant Transfer Ledger attached to the Amended Complaint.

As it concerns D. Bianca, the Trustee has established the damages he alleged in the Twelfth and Fourteenth Counts. The Trustee has established that the Debtors through the IOLTA Account as directed by Malley, transferred to D. Bianca through a check payable to Timothy Sheehan, D. Bianca's divorce attorney the sum of $520,066.66, and that said sums constitute a fraudulent transfer voidable under §544(b)(1) and 548(a)(1) and recoverable under §550(a)(1) and (2). The necessary details of the transfer are also established through the Kosowsky Report, Pl. Ex. A, Schedule 7a, Pl. Ex. 8B and Tr. 6/13/11 at 191-192.

To the extent that the Plaintiff has actually recovered and been paid on behalf of the estate for fraudulent transfers or preferences from other transferees so that if recovered from these Defendants it would represent a double recovery, the Plaintiff must offset the amount already recovered from the damages otherwise awarded against the particular Defendant and make a written accounting for same to the respective Defendant. Likewise, to the extent that the damages awarded herein against one Defendant are duplicative of an award against another Defendant, such as where one is the initial transferee of a transfer and the other a subsequent transferee of the same transfer, the Plaintiff is only entitled to a single satisfaction for the benefit of the bankruptcy estate in accordance with Bankruptcy Code §550(d). *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 149 (Bankr. S.D.N.Y. 2014) (while the aggregate subsequent transfer claim can greatly exceed the amount of the initial transfer, the trustee is entitled to only one satisfaction). Should it develop that after reasonable efforts the Plaintiff and Defendants are unable to agree on the most equitable manner to allocate the apparently duplicate recoveries, the parties may return to this Court to

88

seek guidance.  *See Bank of America v. Veluchamy (In re Veluchamy)*, 524 B.R. 277, 310

(Bankr. N.D. Ill. 2014) (court there applies equivalence of marshaling of assets).

J.    *Plaintiff's Additional Claims for Relief.*

    1.    *Request for Disallowance of Claims Filed by Defendants.*

Although the Plaintiff asked that the Court disallow claims that may in the future be filed

by the Defendants in accordance with Fed. R. of Bankr. Pro. 3002(c), the Court recommends

the District Court deny the Plaintiff's request for such an order, the Plaintiff having failed to

substantiate the basis therefor in Trustee's Post Trial Brief and Trustee's Reply Brief and the

request should be deemed abandoned.  If the Defendant(s) file proofs of claim, the Plaintiff

is free to file an objection to the claims pursuant to Fed. R. of Bankr. Pro. 3007(a) and

substantiate the legal and/or factual basis for his objection at that time.

    2.    *Request for Allowance of Attorney's Fees.*

Although the Plaintiff requested  the Court to award the Plaintiff attorney's fees for

prevailing in this proceeding, the Court recommends the District Court deny the Plaintiff's

request for such an order, the Plaintiff having failed to substantiate the legal and/or factual

basis therefor in Trustee's Post Trial Brief and Trustee's Reply Brief and the request should be

deemed abandoned.  *See Hirsch v. Steinberg, (In re Colonial Realty Co.),* 226 B.R. 513, 527

(Bankr. D. Conn. 1998) ("court denies the trustee's request for an award of attorneys' fees

because he has provided no support for such an award in any of his post-trial briefs.").

    3.    *Request for Prejudgment Interest and Costs.*

The Plaintiff has also requested that prepetition interest be allowed on the proposed

judgment, as well as costs.  In finding its authority to award pre-judgment interest in preferential

or fraudulent transfer causes of action, courts generally look to Bankruptcy Code §550(a) which

provides for the recovery for the benefit of the estate of the *value* of the transferred property.

*McHale v. Boulder Capital, LLC*, *(In re The 1031 Tax Group)*, 439 B.R. 84, 87 (Bankr. S.D.N.Y.

2010)  The awarding of interest serves to satisfy the goal of §550 which is "putting the estate

back where it would have been but for the transfer."  *Collier on Bankruptcy* §550.02[3][a] at

550-11 (16th ed. 2014).  An award of prejudgment interest is … within the [bankruptcy] court's

broad discretion." *United States v. National Westminster Bank USA (In re Q-C Circuits Corp.*,

231 B.R. 506, 513-14 (Bank. E.D.N.Y. 1999).

> The Second Circuit has indicated that the following factors are relevant
> when considering whether to exercise discretion and award prejudgment interest:
> "(i) the need to fully compensate the wronged party for actual damages suffered,
> (ii) considerations of fairness and the relative equities of the award, (iii) the
> remedial purpose of the statute involved, and/or (iv) such other general principles
> as are deemed relevant by the court." *Wickham Contracting Co., Inc. v. Local
> Union No. 3, Int'l Bd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833-34 (2d
> Cir.1992).

*Official Committee of Unsecured Creditors v. Wellner (In re Affinity Health Care,*

*Management, Inc.),* 499 B.R. 246, 266 (Bankr. D. Conn. 2013).

The Court is unaware of any reason why an award of prejudgment interest in this case

would be unreasonable or unjust.  "A court may appropriately consider both fairness and the

relative equities of the parties as well as 'such other general principles as are deemed relevant

by the court,' including the extent to which a defendant acted innocently and had no reason to

know of the wrongfulness of his actions, or where there is a good faith dispute between the

parties as to the existence of any liability. *See Wickham Contracting Co. v. Local Union 3*, 955

F.2d at 834-35." *Official Committee of Unsecured Creditors v. Wellner*, 499 B.R. at 267.  The

Defendants here were well aware prior to the filing of this adversary proceeding that the

Debtors were engaged in running a Ponzi scheme and therefore, that transfers made in the

course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors. A transfer that constitutes an actual or intentional fraudulent conveyance under Section 548(a)(1)(A) may be avoided in its entirety — as to both invested principal and profits — whether or not the debtor received value in exchange for the transfer.

Thus, the initial transferees such as the Malleys knew that regardless of any defense they could have put forward under 548(c), they were still going to be liable to repay their profits to the estate.  While the full liability of subsequent transferees such as LaBonte, was not as apparent, particularly where certain elements of law were more open to dispute than they are now – such as the relative burdens of proof, nevertheless, as the facts have shown, LaBonte was not only aware of the Ponzi scheme prior to suit being filed but should have been aware that he could not meet the two-part good faith test whether applied under §548(c) or §550(b).

This adversary proceeding arises under both state and federal law and "where the cause of action itself has its genesis in state law, the proper interest rate to apply when calculating prejudgment interest is the relevant state law." *Comm. of Unsecured Creditors of Interstate Cigar Co. v Interstate Distrib., Inc.* (*In re Interstate Cigar Co., Inc.*), No. 890-81248-478, 2002 Bankr. LEXIS 781, *6 (Bankr. E.D.N.Y. July 26, 2002) (citing cases).  Nevertheless, where as here there is an intersection of both federal and state law but the basis for recovery for the transfers avoided under §544, 547 and 548 arise under §550, the Court concludes that federal law predominates and recommends that the District Court's determination of the appropriate interest rate be based upon federal law. *See David Cutler Indus. LTD v. Bank of Amer. (In re David Cutler Indus. LTD*, 502 B.R. 58, 79, n. 26 (Bankr. E.D. Pa. 2013).

The Plaintiff asks this Court to allow interest to the Plaintiff at the rate of 10% as set by Conn. Gen. Stat. §37-3a.  However, the Connecticut Supreme Court has held that because §

91

37-3a provides that interest "may be recovered," (emphasis added), the statute does not require an award of interest in every case in which money has been detained after it has become payable. Rather, an award of interest is discretionary. *Sears, Roebuck & Co. v. Board of Tax Review*, 241 Conn. 749, 766 (1997). Likewise, in the Second Circuit, the prejudgment interest rate is also subject to the court's discretion. *See SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996). Nor is there is a federal statute setting the appropriate rate of prejudgment interest.

The Plaintiff has not set forth with particularity any reasons why the rate he seeks would be appropriate under the circumstances. In determining the appropriate prejudgment interest rate Courts have applied a variety of formulas – state statutory rates, Internal Revenue Service underpayment rates, the prime rate and the federal statutory post-judgment rate, 28 U.S.C. §1961,[76] but all generally with the same intent – to restore the Plaintiff to where it would have been if the the transfers had not taken place and the Plaintiff had been able to earn interest on those funds. The transfers that are the subject of this adversary proceeding took place over an extended period of time. Allowing the Plaintiff prejudgment interest at a rate of 10% would be giving the Plaintiff a windfall since neither the Federal Funds Target Rate[77] available in August 2007 (when the first transfers were received by Malley), the federal prime rate[78] nor the

---

[76]That provision reads, in part: "Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." 28 U.S.C. § 1961(a).

[77]The Federal Funds Target Rate is the rate banks charge each other for overnight loans.

[78]The prime rate is the Federal Funds Target Rate plus 3 points. It is the rate at which banks will lend money to their most-favored customers and is an index used by banks to set rates on many consumer loan products.

Treasury Bill Rates of varying durations approached 10% and all have steadily declined since. *See Weber v. FujiFilm Med. Sys. U.S.A.*, 933 F. Supp. 2d 285, 305 (D. Conn. 2013) ("in light of Defendants' evidence of the low interest rate climate in the recent past, the Court finds that awarding ten percent compounded interest would provide an unwarranted windfall to Plaintiff.")

On the other hand, LaBonte does not discuss the issue of interest other than to explain why in his view, Conn. Gen. Stat. §37-3a is inapplicable. The Malleys, while opposing any award of pre-judgment interest on the ground that the equities of the case do not support it, also state that if any prejudgment interest is to be awarded, it should be based upon the rate paid on the 52-week U.S. Treasury Bills "applicable on the date the Complaint was filed," in other words, a rate virtually identical to that of 28 U.S.C. §1961.

However, the federal statutory judgment rate is only expressly applicable to interest awarded on a post-judgment basis in federal courts and is not clearly intended as is pre-judgment interest to make a plaintiff whole for his injury. Thus, in *Cappiello v. ICD Publications,* 720 F.3d 109 (2d Cir. 2013), the Second Circuit Court of Appeals pointed out that "[u]nlike pre-judgment interest, post-judgment interest is not awarded to make a plaintiff whole  for his injury" and that "[s]ection 1961 acts only upon final federal judgments, not upon the claims – whether state or federal – that give rise to, and are extinguished by, them." *Id* at 115.

On the other hand, the prime rate better compensates the Trustee for his loss of funds, is a better reflection of the market place and would more closely make the Trustee "whole." The United States Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. 465, 479, 124 S. Ct. 1951 (2004), in setting an appropriate interest for a secured creditor in a Chapter 13 case in order to pay the creditor the present value of its claim, looked favorably on the prime rate, stating that it "reflects the financial market's estimate of the amount a commercial bank should charge a

creditworthy commercial borrower to compensate for the loan's opportunity costs, the inflation risk, and the relatively slight default risk."[79]  Therefore, exercising its discretion in establishing the applicable rate of interest, the Court recommends that the District Court find the prime rate to be an appropriate rate to apply in this case.  This rate was also found appropriate in such cases as *McHale v. Boulder Capital LLC*, 439 B.R. at 88-92 and cases cited therein, (court applies the prime rate "to fully compensate the Trustee for the injury to the Debtors as a result of the three fraudulent transfers"); *U.S. Philips Corp. v. Iwasaki Electric Co., LTD,* 607 F. Supp. 2d 470, 483 (S.D.N.Y. 2009); *Bank of America v. Veluchamy (In re Veluchamy)*, 524 B.R. at 323; and *Webster v. Harris (In re NETtel Corp., Inc.)*, 327 B.R. 8 (Bankr. D.C. 2005).

The Plaintiff also argues that interest should commence from the date of each transfer but has made no effort to perform the complex and time consuming task of establishing for each of the dozens of transfers what the amount due would be.  Further, because this adversary proceeding concerns initial and subsequent transfers of the same dollars on different dates, having the prejudgment interest rate run from the date of each transfer would create substantial confusion, uncertainty and expense for the parties attempting to abide by the proscription in Bankruptcy Code §550(d) that the "trustee is entitled to only a single satisfaction. . . ."

A number of courts take the position that prejudgment interest should run from the date the demand for the return of the unauthorized transfers was made:

> [p]rejudgment interest on a preferential transfer is recoverable from the date the return of the transfer was demanded, unless there is a sound reason otherwise. 5 *Collier on Bankruptcy* P 547.15 (15th Edition Revised); *In re Nelson Co.*, 117 B.R. 813, 818 (Bankr. E.D. Pa.1990) (stating that consensus position is that

---

[79]In that case because the payments were expected to be made by the debtor the court made an interest rate adjustment upward to reflect the additional risk of non-payment.  The Defendants in this adversary proceeding are not debtors and there was no evidence introduced supporting an upward adjustment.

prejudgment interest does not begin to accrue until some affirmative demand is made for return of preferential transfer). If no pre-litigation demand is made, then interest accrues from the date suit is filed.

In this case, the Plaintiff does not indicate either in the original Complaint or the Amended Complaint the date of demand from the Defendants, assuming they were made. Further, where dates of demand differ for each Defendant, the same difficulties as noted above would likely arise. Therefore, the Court recommends to the District Court that pre-judgment interest, calculated at the prime rate shall commence on November 12, 2010, the date of the filing of the Amended Complaint so as to avoid, as noted above, unnecessary litigation at the expense of all parties but particularly, at the expense of the bankruptcy estate over the appropriate credit to be applied upon the repayment of initial or subsequent transfers of the same dollars. In October 2010, the prime rate was 3.25% and has remained unchanged. The Bankruptcy Court also recommends that the District Court set the post-judgment interest rate at the present Federal Judgment Rate, 28 U.S.C. §1961 and that the Plaintiff be permitted to submit a bill of costs.

## VI  CONCLUSION

In accordance with the Court's findings of fact and conclusions of law, the Court recommends that the United States District Court grant judgment in favor of the Plaintiff against all of the Defendants on the First, Second, Fourth, Sixth, Eight, Eleventh, Twelfth, and Fourteenth Counts of the Amended Complaint and the Plaintiff, acting on behalf of the bankruptcy estate recover the following:

(1)  from Defendant Edward Malley, damages in the sum of $14,237,720.77, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010;

(2)  from Defendant Tracey Malley, damages in the the sum of $1,063,132.50, together with prejudgment interest at the prime rate of 3.25% commencing

November 12, 2010;

(3)     from Defendant, Edward Malley Revocable Trust damages in the sum of $667,500, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010;

(4)     from Defendant, Laundry Express, LLC, damages in the sum of $2,000, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010;

(5)     from Defendant, RCZS, LLC, the sum of $139,141, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010;

(6)     from Defendant, Scott LaBonte, the sum of $7,241,797.52, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010;

(7)     from Defendant, SAL Cranston, LLC, the sum of $221,000, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010;

(8)     from Defendant, SAL North Haven, LLC, the sum of $180,000, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010;

(9)     from Defendant, Devcon Commons, LLC, the sum of $4,058.35, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010;

(10)    from Devcon Manchester, LLC, the sum of $13,316.56, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010;

(11)    from Deborah Bianca, the sum of $520,066.66, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010,

said sums to be reduced and adjusted as required by Bankruptcy Code §550(d).

Dated: May 11, 2015                                    BY THE COURT


_Albert S. Dabrowski_
**Albert S. Dabrowski**
**United States Bankruptcy Judge**

96